# UNITED STATES DISTRICT COURT

for the
EASTERN DISTRICT OF WISCONSIN

*In the Matter of the Search of*

Case Number: 12-m-483

farmlandmarketinggroup.com; farmlandmarketinggroup2.com
growersliquidityfund.com; americanfarmlandpartners.net;
americanfarmlandpartners.mobl; americanfarmlandpartners.info;
americanfarmlandpartners.org; americanfarmlandpartners.me;
americanfarmlandpartners.ca; americanfarmlandpartnersstore.com;
americanfarmlandpartners.biz; americanfarmlandpartners.us;
theamericanfarmlandpartners.com; americanfarmlandpartners.com;
americanfarmlandpartners.tv; theagriculturealnetwork.com;
midwestfarmlandpartners.com; midwestfarmlandpartners2.com;
farmersunite.com; tracylynnboltonagriculture.com;
todddyeragriculture.com; tracylynn - Tracy
Bolton - shopper ID 50098270 (online storeage - 100GB); and
tracy@farmlandmarketinggroup.com - Tracy Bolton - shopper ID
42373755 (online storage - 1GB) that is stored at premises owned,
maintained, controlled, or operated by GoDaddy.com, LLC, a company
headquartered at 14455 N. Hayden Road, Ste. 219, Scottsdale, AZ 85260.

## APPLICATION & AFFIDAVIT FOR SEARCH WARRANT

I, Rhonda R. Karpinski, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment F**

located in the Eastern District of Wisconsin there is now concealed: **See Attachment F1, which is hereby incorporated by reference.**

The basis for the search warrant under Fed. R. Crim. P. 41(c) is which is (check one or more):

✓ evidence of a crime;
❑ contraband, fruits of a crime, or other items illegally possessed;
❑ property designed for use, intended for use, or used in committing a crime;
❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

Title 18, United States Code, Sections 1341, 1343, 1956, and 1957.

The application is based on these facts:

✓ See attached Affidavit, which is incorporated by reference.

Applicant's signature

Name and Title: Rhonda R. Karpinski, Special Agent, IRS

Sworn to before me, and signed in my presence.
Date June 25, 2012 at 3:25 PM

*Judge's signature*

City and state: Milwaukee, Wisconsin

THE HONORABLE WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge
*Name & Title of Judicial Officer*

## ATTACHMENT F

### Property to Be Searched

This warrant applies to information associated with the following:

a. FARMLANDMARKETINGGROUP.COM
b. FARMLANDMARKETINGGROUP2.COM
c. GROWERSLIQUIDITYFUND.COM
d. AMERICANFARMLANDPARTNERS.NET
e. AMERICANFARMLANDPARTNERS.MOBI
f. AMERICANFARMLANDPARTNERS.INFO
g. AMERICANFARMLANDPARTNERS.ORG
h. AMERICANFARMLANDPARTNERS.ME
i. AMERICANFARMLANDPARTNERS.CA
j. AMERICANFARMLANDPARTNERSSTORE.COM
k. AMERICANFARMLANDPARTNERS.BIZ
l. AMERICANFARMLANDPARTNERS.US
m. THEAMERICANFARMLANDPARTNERS.COM
n. AMERICANFARMLANDPARTNERS.COM
o. AMERICANFARMLANDPARTNERS.TV
p. THEAGRICULTURALNETWORK.COM
q. MIDWESTFARMLANDPARTNERS.COM
r. MIDWESTFARMLANDPARTNERS2.COM
s. FARMERSUNITE.COM
t. TRACYLYNNBOLTONAGRICULTURE.COM
u. TODDDYERAGRICULTURE.COM
v. TRACYLYNN - TRACY BOLTON – SHOPPER ID 50098270 (ONLINE STORAGE – 100GB)
w. TRACY@FARMLANDMARKETINGGROUP.COM - TRACY BOLTON – SHOPPER ID 42372755 (ONLINE STORAGE – 1GB)

that is stored at premises owned, maintained, controlled, or operated by **GoDaddy.com, LLC** a company headquartered at **14455 N. Hayden Road, Suite 219, Scottsdale, Arizona, 85260.**

## ATTACHMENT F1

### Particular Things to be Seized

### I.    Information to be disclosed by GoDaddy.com LLC

To the extent that the information described in Attachment F is within the possession, custody, or control of **GoDaddy.com LLC**, including any messages, records, files, logs, or information that have been deleted but are still available to **GoDaddy.com LLC**, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), **GoDaddy.com LLC** is required to disclose the following information to the government for each account or identifier listed in Attachment F:

a.    all records or other information pertaining to that account or identifier, including all files, databases, and database records stored by **GoDaddy.com LLC** in relation to that account or identifier;

b.    all information in the possession of **GoDaddy.com LLC** that might identify the subscribers related to those accounts or identifiers, including names, addresses, telephone numbers and other identifiers, e-mail addresses, business information, the length of service (including start date), types of services utilized, means and source of payment for services (including any credit card or bank account number), and information about any domain name registration;

c.    all records pertaining to communications between **GoDaddy.com LLC** and any person regarding the account or identifier, including contacts with support services and records of actions taken.

### II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18 United States Code, Sections 1341, 1343, 1956 and 1957 involving **Todd Allen Dyer, Nicholas Hindman**, and **Tracy Lynn Bolton** since September 1, 2008, relating to the

development, publishing, advertisement, access, use, administration or maintenance of any website enumerated in Attachment F, including:

1.    files, databases, and database records stored by **GoDaddy.com LLC** on behalf of the subscriber or user operating the website, including:

> a. programming code used to serve or process requests made via web browsers;
>
> b. HTML, CSS, JavaScript, image files, or other files;
>
> c. HTTP request and error logs;
>
> d. SSH, FTP, or Telnet logs showing connections related to the website, and any other transactional information, including records of session times and durations, log files, dates and times of connecting, methods of connecting, and ports;
>
> e. MySQL, PostgreSQL, or other databases related to the website;
>
> f. email accounts and the contents thereof, associated with the account.

2.    Subscriber information related to the accounts established to host the site enumerated in Attachment F, to include:

> a. Names, physical addresses, telephone numbers and other identifiers, email addresses, and business information;
>
> b. Length of service (including start date), types of service utilized, means and source of payment for services (including any credit card or back account number), and billing and payment information;
>
> c. If a domain name was registered on behalf of the subscriber, the date that the domain was registered, the domain name, the registrant information, administrative contact information, the technical contact information and billing contact used to register the

domain and the method of payment tendered to secure and register the Internet domain name.

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS

I, RHONDA KARPINSKI being duly sworn, depose and state as follows:

## I. Introduction

1.      I am currently employed as a Special Agent with the Criminal Investigation Division of the Internal Revenue Service (IRS-CI), United States Treasury Department and have been so employed since June of 2001. I hold a Bachelor of Business Administration degree in Accounting and Management Information Systems from the University of Wisconsin. Since becoming a Special Agent, I have received specialized training in conducting criminal investigations of suspected violations of federal income tax and related laws, including money laundering. My responsibilities include the investigation of criminal violations of the Internal Revenue Laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, United States Code, Sections 1956 and 1957), and related offenses.

2.      I am currently assisting the United States Attorney's Office in the Eastern District of Wisconsin with a grand jury investigation of **Todd Dyer, Melvin Krumdick, Tracy Bolton**, and **Nicholas Hindman Sr**. This investigation involves possible violations of the following offenses: (1) money laundering in violation of 18 U.S.C. §§ 1956 and 1957, (2) mail fraud in violation of 18 U.S.C. § 1341, and (3) wire fraud, in violation of 18 U.S.C. § 1343. I have not included each and every fact I know about the individuals and events described herein but rather only the facts that I believe are necessary to establish probable cause for the issuance of the search and seizure warrants. The information contained in this affidavit is based on my firsthand knowledge, review of records, and information I have received from other law enforcement officers and witnesses, all of whom I believe to be truthful and reliable.

3. I make this affidavit in support of an application for search warrants authorizing the search of items located at the following locations:

a) The residence of **Todd Dyer** located at **813 Kendall Lane, Lake Geneva, Wisconsin**;

b) The residence of **Melvin Krumdick,** located at **1178 South Elmwood Avenue, Oak Park, Illinois**; and

c) The residence of **Tracy Bolton** located at **31615 Tall Grass Court, Lakemoor, Illinois**.

The information to be searched is described in the following paragraphs and in Attachments A, C, and E.

4. I also make this affidavit in support of an application for a search warrants for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by the following:

a) **GoDaddy.com, LLC,** a web hosting company and email provider headquartered at **14455 North Hayden Road, Suite 219, Scottsdale, Arizona.**

b) **AOL, Inc.,** an email provider headquartered at **22000 AOL Way, Dulles, Virginia.**

c) **Yahoo! Inc.,** an email provider headquartered at **701 First Avenue, Sunnyvale, California.**

d) **Google Inc.,** an email provider headquartered at **1600 Amphitheater Parkway, Mountainview, California.**

The information to be searched is described in the following paragraphs and in Attachments F, G, H, I, and J. This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** to disclose to the government records and other information in its possession

2

pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

## II. Background

**Dyer's prior convictions of federal mail fraud and money laundering offenses arising out of his operation of a Ponzi scheme**

5.    In October 1999, in Case # 98-CR-176 (E.D. Wis.), **Todd Dyer** was convicted of mail fraud and money laundering for operating a fraudulent Ponzi-type investment scheme in which **Dyer** defrauded investors of more than $2.2 million.

6.    From approximately May 1990 through November 1997, as a part of that scheme, **Dyer** advertised himself as an annuity broker and investment advisor through radio ads, billboards, and other means. **Dyer** placed some investor funds in annuities with legitimate insurance companies. **Dyer** also offered customers other fraudulent investment programs that he represented to be safe and to pay high rates of return.    **Dyer** solicited his customers to make small investments in those fraudulent investment programs.    **Dyer** then made payments to those investors using other investors' money on the false pretense that he was paying high rates of returns on their investments. As he obtained the confidence of his customers, most of whom were elderly, and obtained knowledge of their other investments, most of which were in the form of retirement annuities, he encouraged them to invest larger sums of money through the various companies he created as part of his investment fraud scheme.

7.    In order to obtain funds and maintain their trust, **Dyer** provided his investors with false and misleading information, including false letters on business stationary confirming their purchase of preferred stock, false account statements, false earnings projections, and fabricated private placement memorandums.

3

8.     In order to conceal his theft of investor funds, **Dyer** deposited investor checks into bank accounts he controlled, or converted the checks into money orders, and he then converted the investor funds to his own use by either spending the money or depositing it into other bank accounts he controlled. **Dyer** sometimes conducted multiple financial transactions designed to conceal that he was converting investors' funds to his own use. For example, he exchanged investment checks for cash, then purchased cashier's checks with the cash, deposited those cashier's checks into a bank account, and then used those funds to write personal checks or purchase additional cashier's checks.

9.     **Dyer** did not invest his customers' funds in or through the entities he created. Instead, Dyer used his customers' monies to repay interest to previous investors, pay personal expenses, and to purchase personal items.

10.     On March 30, 1999, **Dyer** pleaded guilty to one count of mail fraud and one count of Money Laundering. On October 8, 1999, he was sentenced to 70 months in federal prison and ordered to pay more than $2.2 million in restitution. **Dyer** was released from the Federal Bureau of Prisons on December 21, 2004, and served three years probation until December of 2007. According to the U.S. Attorney's Office, Dyer currently owes more than $2,224,000 in restitution towards that order.

11.     From June 1997 through October 1999, **Todd Dyer** also obtained an additional $1.1 million from a Chicago school teacher, M.P, through a fraudulent investment scheme as described above. The Wisconsin Circuit Court Access database indicates that M.P. filed a civil lawsuit in Walworth County Wisconsin on December 20, 2001, against **Todd Dyer** and **Todd Dyer's** father, James Dyer. On July 10, 2002, **Todd Dyer** was ordered to pay M.P. more than $4 million in damages. According to the case file, James Dyer settled with M.P. for $400,000 through mediation.

4

**Background of Melvin Krumdick**

12.    **Melvin Krumdick** was ordained as a priest at Maryknoll, New York, on May 24, 1969.    On September 26, 1997, Maryknoll (Catholic Foreign Mission Society of America) informed the Archdiocese of Chicago that **Krumdick** was not in good standing and Krumdick was suspended from all priestly ministries.  **Krumdick** was formally dismissed from Maryknoll on June 24, 1999.

**Summary of current investigation**

13.    I prepared this affidavit in connection with the investigation of **Todd Dyer, Melvin Krumdick, Tracy Bolton**, and **Nicholas Hindman, Sr.** regarding investor funds that they fraudulently obtained through businesses they created, operated, and controlled from 2008 through the present upon the materially false and fraudulent representations that they made to investors that they would invest the funds that they received from investors.  The investigation has revealed that **Todd Dyer, Melvin Krumdick, Tracy Bolton**, and **Nicholas Hindman, Sr.** have not invested funds that they received from investors as promised but that they have instead used those funds for the following non-investment purposes:    making payments to previous investors, paying operational expenses to continue the scheme, and converting the funds to their personal uses.  In short, the investigation shows that **Todd Dyer, Melvin Krumdick, Tracy Bolton**, and **Nicholas Hindman, Sr.** have been operating a Ponzi scheme.

5

### III. Facts supporting findings of probable cause

**Initiation of current investigation**

14.    In September 2010, I received a phone call from Mark Dorman, an examiner with the State of Wisconsin, Department of Financial Institutions, Division of Securities, Bureau of Enforcement, stating that he was investigating **Todd Dyer** concerning sales of investments of **Midwest Farmland Partners (MFP)** to individuals in Wisconsin. Dorman had previously investigated **Todd Dyer**, Case Number X-93023, which resulted in a Summary Order of Prohibition and Revocation being issued to **Dyer** on May 3, 1993. Dorman stated that **Dyer** may have stolen $500,000 in 2008 from an investor named Mark Borst and $75,000 recently from an investor named P.D., both from Lake Geneva, Wisconsin.

15.    On August 26, 2010, Dorman contacted P.D. regarding her investment with **Dyer**. P.D. stated that, based on **Dyer's** representations to her, P.D. knew **Todd Allen Dyer** as "**Allen Todd**." **Dyer** showed P.D. the **MFP** website and showed P.D. a video about the company. **Dyer** told P.D. that the stock of **MFP** was going to "go public." Dyer told P.D. that she could buy the stock for $2.50 a share, but the price would go up to $5 a share after it did "go public." **Dyer** said the stock would "go public" within 30 to 60 days after investing. P.D. wrote a check to **MFP** for $75,000 using home equity proceeds and gave it to **Dyer**. Within a few hours, **Dyer** returned and said there was no more stock through the company, but if P.D. wanted she could buy stock in the company through an investor, Mark Borst. **Dyer** stated to P.D. that Borst had purchased $2 million in stock and was making so much money in the stock that he'd be willing to sell some of his stock for $75,000. P.D. agreed and made a second check in the amount of $75,000 payable to Mark Borst dated July 10, 2010.

16.    After investing, P.D. became concerned about her investment because she had not received any paperwork from **Dyer**. P.D. contacted Borst after investing

6

in **MFP**. Borst told P.D. he was "comfortable" with P.D. purchasing his stock through **Dyer** and expected P.D. "to double or triple her money in 30 to 60 days." Borst also told P.D. that he did not invest $2 million worth of stock as **Dyer** had represented, rather, it was actually $500,000. Approximately three weeks after P.D. made the investment, **Dyer** attempted to have P.D. sign a disclosure. **Dyer** also told her that if she filed a complaint about the investment that she would never see her money.

17.    Regardless, on July 30, 2010, P.D. filed a complaint with the Lake Geneva Police Department regarding the above transaction with **Todd Dyer** and Mark Borst. On or about August 4, 2010, Lake Geneva Police Department Detective Jeffrey Nethery contacted **Todd Dyer** via telephone and explained to **Dyer** that he had some questions regarding the transaction between Borst and P.D. Detective Nethery asked **Dyer** what he had participated in with the transaction. **Dyer** stated to Detective Nethery that he really had nothing to do with it, the transaction was a private sale, and that he is not licensed to sell. **Dyer** further stated that he made nothing from the sale. Detective Nethery stated to **Dyer** that Nethery was looking into whether or not **MFP** even existed. **Dyer** then asked Detective Nethery not to "stir the pot" or file a complaint with the Federal Trade Commission because that would be counterproductive for everyone involved. Detective Nethery then asked **Dyer** why he presented himself as "**Allen Todd**" to P.D. when he told her about **MFP**. **Dyer** stated to Detective Nethery "haven't you ever used a ruse in business?"

18.    On June 21, 2011, a Google Internet search linked the business of **MFP** to the website www.midwestfarmlandpartners.com. The website listed the address of the business as 3333 Warrenville Road, Suite 200, in Lisle, Illinois. The website promoted the idea that "midwest farmland" is becoming "scarce" and a group of investors are taking "action" to protect the remaining farmland. The website also stated that **MFP** acquires family farms through partnership agreements, whereby the farmers continue to occupy their farms while the partnership manages and protects the interests of its members as a group. Under this structure, farmers receive cash and limited partnership interests as payment for their farms and continue to live and

7

work on the same farmland. In addition, investors could purchase interests in this "valuable real estate" which had an escalating stream of revenues from the production of commodities. The website also listed **Nicholas C. Hindman, Sr.** as the Chief Financial Officer of **MFP**. As of January 31, 2012, the website no longer exists.

19.     On August 26, 2010, Dorman contacted **Nicholas Hindman** on behalf of P.D. to question the **MFP** investments and the relationship between **Hindman** and **Dyer**. Dorman explained to **Hindman** that Dorman was investigating **Todd Dyer** concerning sales of investments to two individuals in Wisconsin involving **MFP**. **Hindman** stated to Dorman that he has two related business entities: One is called **Midwest Farmland Partners Limited Partnership** and the other is called **Midwest Farmland Management Corporation**. **Hindman** stated that no investments have yet been sold in the corporation, which is to manage the farmland that comes into the program, and no farmland has yet come into the program. **Hindman** stated that **Dyer** worked for **Hindman** as a consultant to sell investments of **MFP** and had sold interests to two investors in 2008, but the investors were not from the State of Wisconsin. **Hindman** stated to Dorman that **Dyer** was affiliated with **Midwest Farmland Acquisition Corporation** (a business I know is owned by **Dyer** in Wisconsin). **Hindman** stated that if Borst had invested, the investment would have been in **Dyer's** business and not in **Hindman's** businesses. **Hindman** stated that he knew that **Dyer** had gone to prison for an investment-related conviction and knew that **Dyer** had "issues." Dorman explained to **Hindman** that, in 1993, the Wisconsin Commissioner of Securities had issued an administrative sanction against **Dyer** that revoked all exemptions under which **Dyer** might purport to be selling unregistered securities to persons in Wisconsin. **Hindman** was unaware of the sanction.

20.     On October 7, 2010, Dorman received a telephone call from Mark Borst. Borst stated that he had sold "stock" of **MFP** to P.D. through **Dyer**. Borst told Dorman that **Dyer** had "set up everything for the sale" so that it was done according to "the rules." Borst told Dorman that he sold his stock to P.D. because he needed

8

the money. The transaction between them was a "private offering." **Dyer** told Borst that **Dyer** worked for **MFP** and that **Dyer** was the "creative force" of **MFP**. **Dyer** told Borst, before investing, that the investment money of Borst would be used to buy the farmland of farmers, but that the farmers would still be able to live on the farm and work the farmland. Before investing in 2008, **Dyer** told Borst that Borst would receive stock of **MFP**, which was soon to "go public" and therefore would be worth more to investors like Borst. However, **Dyer** said that Borst would first receive warrants in **Midwest Farmland Acquisition Corp.** (a business of **Dyer's**). Borst invested in **Midwest Farmland Acquisition Corp.** in Lake Geneva, Wisconsin through **Dyer** in 2008, in multiple investment transactions for a total investment of $500,000. Borst used cashier's checks from his bank for the investment transactions, and gave them to **Dyer.** Borst has received paperwork which states that he is to receive stock warrants of **MFP**. Borst also told Dorman he was aware of **Dyer's** "background."

21. Dorman spoke with **Hindman** again on October 7, 2010. **Hindman** told Dorman. **Hindman** had set up a new company in January 2010 named **American Farmland Partners Corporation**. It is a "shell," which consists of only **Hindman.** **Hindman** claimed that he had just "recently [become] aware" that **Dyer** had sold $500,000 of partnership interests of **Hindman's** business to Borst. **Hindman** also reiterated to Dorman that none of the investment money of Borst had gone into **Hindman's** businesses. Instead, it went into **Dyer's** business. **Hindman** stated that **Hindman** was making this change so that investors such as Borst can get stock in **Hindman's** business, and **Hindman** can get **Dyer** out of the business. **Hindman** told Dorman now he "understands" why **Dyer** went to prison.

22. On August 5, 2010, Detective Nethery investigated another complaint involving **Todd Dyer**. The Sycamore Police Department had received a report that on June 7, 2010, **Todd Allen Dyer** had gone to American National Bank in Sycamore, Illinois, and opened a business checking account without depositing any funds into the account. **Dyer** stated that he was the owner of **Midwest Farmland**

9

**Acquisition Corporation** with an address of **813 Kendall Lane, Lake Geneva, Wisconsin.** The bank opened the account and issued **Dyer** temporary checks with the agreement that **Dyer** would complete a wire transfer of $150,000. The $150,000 was never wired into the account. Regardless, **Dyer** began writing checks on the account.

23.     On June 11, 2010, the Sycamore Police Department received a complaint from American National Bank that J.H. and F.I. had shown up at the bank attempting to cash a check from **Dyer's** newly opened business checking account in the amount of $7,650. J.H. and F.I. told investigating Sycamore police officers that they had just sold $153,000 in interests of **Midwest Farmland** to T.G. and that "**Allen Todd**" had issued J.H. a $7,650 check "as payment for the commission relating to the sale to T.G." An officer from the Sycamore Police Department contacted **Dyer** by telephone. **Dyer** admitted to opening the account, but stated he had never written any checks on the account. Further investigation shows that:

    a. On June 12, 2010, **Todd Dyer** called an American National Bank employee and stated that there had been a mistake in a transfer of funds into the account and that he would drive to the bank to make a deposit. No deposit was ever made.

    b. On or about June 12, 2010, J.H. received a bank money order in the amount of $7,650 from a bank account in the name of **Todd Dyer / Midwest Farmland Acquisitions Corp.**

**Midwest Farmland Management Corporation's registered officers and agents**

24.     As of January 25, 2012, **Nicholas C. Hindman, Sr.** is listed as the registered agent for **Midwest Farmland Management Corporation** on the Illinois Secretary of State corporate record website. The corporation detail report states that the business was incorporated on August 4, 2008, and the registered agent's

10

address was located at 3333 Warrenville Road, Suite 200, in Lisle, Illinois (virtual office). The report lists the President as **Mel Krumdick**, with the same business address. The report also shows the business status as active as of January 14, 2011. **Nicholas C. Hindman, Sr.** is also listed as the registered agent for **American Farmland Partners Corporation** on the Illinois Secretary of State corporate record website. The corporation detail report states that the business was incorporated on April 5, 2010, and the registered agent's address was located at 3333 Warrenville Road, Suite 200, in Lisle, Illinois. The report lists **Nicholas C. Hindman, Sr.** as the President, however, with an separate address of **6070 State Route 53, Suite B, Lisle, Illinois**. The report shows the business status as active.

### Midwest Farmland Acquisition Corporation's registered officers and agents

25. As of January 25, 2012, the Wisconsin Department of Financial Institutions corporate record database listed a business known as **Midwest Farmland Acquisition Corporation**. The registered agent is listed as **Melvin Eugene Krumdick** with **Todd Dyer's** home address of **813 Kendall Lane, Lake Geneva, Wisconsin**. The business was registered with the State of Wisconsin on February 28, 2008, went into delinquent status as of January 1, 2010, and was administratively dissolved on March 15, 2011.

### Statements of Todd Dyer's former girlfriend, J.W., regarding Dyer's laundering of proceeds of Dyer's prior fraud scheme

26. On November 25, 2010, and November 26, 2010, Detective Robert Craig, with Walworth County Sheriff's Office, interviewed **Todd Dyer's** former girlfriend J.W. Also, on December 3, 2010, FBI Special Agent Michael Johnson and I interviewed J.W. J.W. stated the following: J.W. stated that she had information about her ex-boyfriend, **Todd Dyer** also known as "**Allen Todd**." She had two children with **Dyer**. J.W. met **Dyer** while he was still incarcerated in Chicago, Illinois. On December 21, 2004, Dyer was released from prison, and five days later, on

11

December 26, 2004, J.W. left the Chicago area with **Dyer**. As soon as **Dyer** was released from prison, **Dyer** had a lot of money. "Father Mel," a priest who worked in Mexico at times, and whose name was **Melvin Krumdick,** would get **Dyer** money. **Dyer** would ask **Krumdick** for money, **Krumdick** would get the money and take out a fee out. J.W. thought the money was maybe coming from California and from Mexico. J.W. stated that the money **Krumdick** was giving to **Dyer** was derived from **Dyer's** previous fraud scheme. The money was wired into **Krumdick's** account and **Krumdick** would then withdraw the money in cash and bring it to **Dyer**.

**Statements of Todd Dyer's former girlfriend, J.W., regarding Todd Dyer's father, James Dyer**

27.    J.W. further stated that, she had lived with **Todd Dyer** since 2005 at **813 Kendall Lane, Lake Geneva, Wisconsin.** J.W. said **Dyer** paid his father, James Dyer, to buy the house located at **813 Kendall Lane** for **Dyer**. The house was put in James Dyer's name because **Dyer** was afraid that the people to whom **Dyer** owed restitution would take it away from him. J.W. stated that there is a bank account at Peoples Bank, in the name of **Jadken LLC**, and that **Dyer's** father or mother had opened this account. J.W. stated the purpose of the Jadken LLC account was to provide protection from creditors. J.W. stated **Dyer** gives James Dyer money and James Dyer gives the money back to **Dyer. Dyer** told J.W. the purpose is to gift the money so **Dyer** does not have to pay taxes on it.

28.    As of January 26, 2012, the Walworth County Treasurer Tax Bill Information Search website shows that Parcel ZGHT 00002 (**813 Kendall Lane, Lake Geneva)** is currently owned by **Jadken LLC,** with an address of **123 Terrace Drive, Lake Geneva, Wisconsin** (James Dyer's residence). Also on the above date, I checked the corporate records database website of the Wisconsin Department of Financial Institutions, Division of Corporate and Consumer Services. Those records show that the registered agent of **Jadken LLC** is James Dyer with an address of **123 Terrace Drive, Lake Geneva, Wisconsin**. The business was registered on July 9, 2008 and the last annual report was filed for the 2011 year.

12

**J.W.'s statements regarding Dyer's "Midwest Farmland Partners" investment
fraud scheme**

29.     J.W. stated that **Dyer** was involved in an investment fraud scheme. J.W.
stated that, through a company **Dyer** had established, **Midwest Farmland Partners**,
**Dyer** would try to find investors to invest money into farmland. J.W. stated that, after
**Dyer** received investors' money for this purpose, **Dyer** bought no farmland. **Dyer**
wanted to buy farmland from James Dyer to make the company look legitimate, but
James Dyer did not sell **Dyer** any farmland. J.W. said that **Dyer** had hired **Nicholas
Hindman** to be the "face of the company." **Hindman** is supposed to contact
potential investors for **Dyer.** J.W. stated that **Dyer** pays people to do the work, but
that **Midwest Farmland Partners** is **Dyer's** company. Dyer usually brings in the
investors and "calls all the shots." **Dyer** uses stationary that says the business is
located in Lisle, Illinois, but the stationary itself and the computer he uses are
located in the basement at **813 Kendall Lane Lake Geneva, Wisconsin.** J.W.
stated that **Dyer** had destroyed a few computers over the years and that a few
months ago, **Dyer** scrambled a hard drive to get rid of information.

30.     J.W. stated that **Dyer** has advertised the business on Internet websites,
YouTube, and on WFMT, a classical radio station in Chicago, Illinois. J.W. stated
that **Dyer** was trying to target older people by advertising on the classical radio
station. **Dyer** also purchases contact lists of people that make over a certain dollar
amount according to J.W. She thought the lists **Dyer** purchased identify people that
make over a $1 million dollars a year. J.W. stated that several people have called
inquiring about the business. J.W. stated that **Dyer** looks them up using the Internet
and screens them to see "how much money they are worth." **Dyer** also uses the
Internet to see what kind of house they live in. **Dyer** also pays money to various
websites to obtain more information on potential investors. J.W. said **Dyer** has a
DVD, business card, and a prospectus concerning the business that he sends to
clients. J.W. stated that **Dyer** has bank accounts at Walworth Bank and Chase

13

Bank.

31.    J.W. stated **Dyer** also set up other companies, one was **American Farmland Partners.**    **Dyer** told her that a woman from a fingernail salon (believed to be P.D., who does own a nail salon) had complained to the SEC.    J.W. said people who bought shares or warrants from **Dyer** included F.I. and T.D.    J.W. said that people were trying to distance themselves from **Dyer** because they were realizing it was fraud.    J.W. stated that **Dyer** also has another business known as **Borst Marketing Group** and **Dyer** is in charge of it.    J.W. stated **Dyer** is also part of the **Agricultural Network** and J.C. (who assists **Dyer** in creating websites) has something to do with it.

32.    On December 3, 2010, I showed J.W. a copy of a prospectus (provided to P.D. around July of 2010) of **Midwest Farmland Limited Partnership**.    J.W. was questioned on individuals who were listed in the prospectus and their relationship to the business.    **Dyer** hired J.H. (listed as President) to bring in investors but he did not do anything.    J.W. stated that J.H. was the son of G.H.    J.W. stated that G.H. was "locked up" with Dyer and that G.H. had lost his law license.    D.D. (listed as Director and Vice President), **Dyer**'s uncle, was also suppose to bring in investors but just took the money.    T.G. has some involvement with the business and J.W. thought that T.G. had invested some money in it.    **Todd Dyer** and J.C. are the only two people that do anything for the company according to J.W.

33.    J.W. stated that **Dyer** also uses storage facilities to store cars and boxes of documents, and to also hide drugs such as cocaine.    J.W. stated that **Dyer** has used at least three different storage facilities around the Lake Geneva, WI area.

**J.W.'s statements regarding Dyer's use of "Funding Structures Corporation" to launder proceeds**

34.    J.W. stated that **Dyer** had created an entity known as "**Funding**

14

Structures Corporation," which **Dyer** had put in J.W.'s name, for the purpose of laundering money. The supposed purpose of the business was to do graphics and web page design for **Midwest Farmland Partners**. The company was established in, and operated out of, the house at **813 Kendall Lane, Lake Geneva, Wisconsin**. Although J.W. had a background in graphic design, there were no real clients. J.W. stated that **Dyer** called it "cleaning the money," that is, putting the money in the business and paying taxes just to show an income. J.W. stated that the business bank account was at Peoples Bank in the name of the business. J.W. thought she was paid $1,500 every two weeks by check. J.W. stated that she cashed the checks and spent the money on groceries and normal household items.

35.     I have analyzed Peoples Bank business checking account xx-0684 for **Funding Structures Corporation**. The account was opened on April 7, 2008, by J.W. and the business address is **813 Kendall Lane, Lake Geneva, Wisconsin.** From April 2008 to December of 2009, approximately $169,000 was deposited into the account. Among these deposits are the following: $101,500 in cashier's checks from **Midwest Farmland**; $25,700 in cash, $11,300 in MoneyGram money orders (unknown source), and $20,000 in checks from C. and A.G. (former owners of **813 Kendall Lane**). A withdrawal analysis for the same time period indicated the following: $32,000 in cashier's checks paid to James Dyer; $7,500 paid to **Jadken LLC;** $30,500 in cashier's checks paid to an unknown payee believed to be J.W. (17 payments for $1,500 each and one for $5,000); $18,000 in checks paid to J.W. (12 payments for $1,500 each with different pay periods in the memo portion of the check); $20,000 paid to C.G. (former owner of **813 Kendall Lane**); $10,726 paid to the Internal Revenue Service; $7,835 paid to Geico and Golden Rule Insurance; $7,900 withdrawn in cash; $3,500 paid to D&G Mainstreet LTD (as known as Vegas Gentlemen's Club); and $241 paid to Aim Tax and Accounting. This financial analysis corroborates J.W.'s statements in the above paragraph.

36.     On August 10, 2011, the corporate records database of the Wisconsin Department of Financial Institutions showed that **Funding Structures**

15

**Corporation's** registered agent was J.W. with an address **813 Kendall Lane, Lake Geneva, Wisconsin.** The business was registered on March 13, 2008, and went into delinquent status as of January 1, 2011.

37.     J.W. stated that, during the time she lived with **Dyer**, **Dyer** had purchased approximately 10-15 cars in J.W.'s name.   J.W. said Mark Borst owns a car dealership (known as Springfield Auto Sales) and purchases cars at the auto auction for **Dyer**.  J. W. stated that **Dyer** brags about how he buys these cars cheaply and later sells them for more money.  J.W. stated that Mark Borst is also laundering money for **Dyer**.  J.W. stated that money gets wired to Borst and then Borst gives **Dyer** cash or cars for the money.  J.W. stated that Borst takes a percentage out of the money he gives **Dyer,** usually 10-15 percent; and that those are the "rules." J.W. has heard **Dyer** make comments over the phone to people that "you are getting your usual."

38.     A Wisconsin vehicle title history check of **Todd Dyer** revealed that approximately thirteen (13) vehicles have been registered with the Wisconsin Department of Motor Vehicles and approximately seventeen (17) in the name of J.W. from April 2005 to July 2011.  In addition, approximately thirteen (13) vehicles were either purchased or sold from/to Springfield Auto Sales.

**Dyer's and Hindman's statements to undercover agents regarding the Midwest Farmland Partners investment scheme**

39.     On October 13, 2010, an IRS-CI undercover agent (UCA) completed a fill-in form with the UCA's contact information at the website of **MFP,** www.midwestfarmlandpartners.com.  Within minutes of filling out the online form, the UCA received a phone call from "**Allen Todd**" **(Todd Dyer)** which was consensually monitored.   "**Allen Todd**" described himself to the UCA as being in "Investor Relations" for the company.  "**Allen Todd**" explained in great detail two types of investments to the UCA, and stated that the minimum investment amount for each

16

investment was $25,000. In one investment, the UCA could purchase partnership interests for $1,000 each with a fixed 6% return. In the other investment, the UCA could purchase stock at $2.50 a share that would be publicly traded within a year. "**Allen Todd**" stated, "We are the only fund in the world doing this." The UCA asked if profits were being paid out on these and "**Allen Todd**" replied, "No, we are just getting started on both of these." "**Allen Todd**" also said that they had been "working on this for 3 years." The UCA inquired about the risk of these investments and "**Allen Todd**" stated that the UCA would have to talk to **Hindman** about those specifics. "**Allen Todd**" requested that the UCA complete an accredited investment questionnaire, and once the UCA filled it out the UCA would receive a telephone call from **Nicholas Hindman**. "**Allen Todd**" stated to the UCA he insists that **Hindman** talk to everyone that invests. After ending the conversation with "**Allen Todd,**" the UCA completed the questionnaire.

40.     The next day, October 14, 2010, "**Allen Todd**" emailed the UCA a prospectus for each type of investment, one for the partnership and one for the corporation. Within the partnership prospectus, it stated that **Nicholas Hindman** is a Certified Public Accountant. On March 5, 2012, I checked the State of Illinois Division of Professional Regulation online database regarding the CPA license of **Nicholas Hindman**. It showed that **Hindman's** CPA license was suspended on September 30, 1997, due to outstanding tax liabilities owed to the Illinois Department of Revenue and failure to file income tax returns.

41.     On October 18, 2010, **Hindman** called the UCA and the conversation was recorded.     **Hindman** explained that **Todd** was the "concept creator" and **Todd** created the (www.midwestfarmlandpartners.com) website.   **Hindman** had been with the company since almost the beginning.     **Hindman** explained each of the investments consistent to what **Dyer** had represented. The UCA asked where the money would be placed once invested. **Hindman** replied that the investment would go in the bank and **Hindman** would oversee the account.

17

42.    On November 10, 2010, the UCA met with "**Allen Todd**" (**Todd Dyer**) and **Nicholas Hindman** at 3333 Warrenville Road, Suite 200, their virtual office in Lisle, IL.    The UCA recorded the conversation.    **Hindman** explained that **American Farmland Partners** had acquired **Midwest Farmland Partners**.    **Hindman** stated that the reason for the change was because "we wanted a broader name" and "wanted a fresh new face" and "put everything into the new company" and "have a clean company to take public."    **Hindman** stated that "**Allen Todd**" "has his own entity and he'll be workin' for us."    "**Allen Todd**" said his new company is **Borst Marketing Group**.

43.    The UCA then questioned **Hindman** and "**Allen Todd**" about specifics of the investments and the company.    Below is a summarized portion of the conversation:

    a. **Hindman** told the UCA that the minimum investment amount into the partnership or the corporation was $10,000 and the return on a partnership investment was projected to be 6%.

    b. **Hindman** stated to the UCA that the projected 6% return on the partnership investment would come from "profits from the farms" and the return would be paid at the end of the year.

    c. The UCA asked how many investors there were right now and **Hindman** replied "ah . . . dozen about."

    d. The UCA asked **Hindman** how much working capital they have right now and **Hindman** replied "we've been floating this for a couple years...so really...very little working capital. . . Really . . . restarting with these new entities."

    e. The UCA asked if anyone had invested in the corporation.    **Hindman** responded "Not yet . . . the bone there is . . . to go public. The investment in the corporation will . . . future return from profits from the farm and going public."

    f. The UCA asked **Hindman** if there are or would be annual reports. **Hindman** replied "Of course . . . all we have had really is investments and a few expenses.    So there is very little there...there is some history but very little history."

18

g. **Hindman** agreed with the UCA that if the UCA made an investment into the partnership the money would be used for the initial purchase of a farms or farms.

h. **Hindman** stated to the UCA that he manages the bank accounts for the investments and that the bank accounts are at MB Financial Bank.

i. The UCA asked if there were any other employees and **Hindman replied** "No . . . myself and **Allen** working it." **Hindman** also stated that there was no one else selling or soliciting investors.

j. The UCA asked **Hindman** how they are able to provide a 6% return because the bank is not providing a 6% return and the investments funds stay in the bank until a farm is purchased. **Hindman** replied, "That will obviously come out of farm rental income." The UCA then stated, "There are no farms . . . are there?" **Hindman** replied, "Obviously any return for the next year will be coming out of farm profits...The other partners that are paying in, we've been paying them six percent since they got in."

k. **Hindman** then told the UCA that they were not earning 6% and were deficit spending at this point. The UCA then asked if the funds investors had initially invested were used for deficit spending. **Hindman** responded "Yeah . . . but it has been minimal; there is not a lot of money expended for that."

44.     On January 12, 2011, the UCA called **Melvin Krumdick** and recorded their conversation. **Krumdick** stated that he has known "**Allen Todd" (Dyer)**, for about 21 years and started investing with him about 7 years ago. **Krumdick** thought **Hindman** first became involved with the business about 3 years ago. **Krumdick** stated that he is the President of one of the businesses (believed to be **Midwest Farmland Management Corporation**) but does not do any day-to-day work for the company. **Krumdick** stated that he is a missionary priest and that, since 1989, he has spent most of his time in Mexico, where he stated that he lived and worked in a Mexican prison. **Krumdick** stated that, for the past two years, he has had back problems and has been unable to travel. The UCA asked if **Krumdick** was happy with his investment, and **Krumdick** replied, "I was hoping it would move a little faster." **Krumdick** stated that he has received no return on his investment and is "just waiting for the IPO." **Krumdick** told the UCA that he has received the prospectus information but has not received any financial documentation relating to his investment. The referral form that "**Allen Todd" (Dyer)** gave the UCA indicated

19

that **Krumdick** had invested $200,000. The UCA inquired about this representation and **Krumdick** stated that **Krumdick** had actually invested $500,000. **Krumdick** said he initially had partnership interests and converted his interests to stock warrants. When the UCA asked if there were any employees, **Krumdick** stated that no employees are really needed because they are "still in the process of setting this whole thing up." **Krumdick** was not sure of the number of investors but stated that there were other investors who had invested more than he had. **Krumdick** stated that Mark Borst was an investor. **Krumdick** referred to **Hindman** as the "financial guy" who "runs the office." **Krumdick** stated that "**Allen Todd**" works on "drawing people to the corporation" through the Internet and the radio. He stated that "**Allen Todd**" writes up the scripts and creates the ideas on how to draw investors and also speaks with the farmers to get their interest. The UCA asked **Krumdick** if he should invest with them. **Krumdick** stated, "Yes, I think it will be a good return."

45.     On March 3, 2011, the UCA met **Todd Dyer, Nicholas Hindman, Melvin Krumdick,** W.C., and M.Q. (I understand that W.C. and M.Q. are assisting with marketing issues) at 3333 Warrenville Road, Suite 200, in Lisle, IL. The UCA recorded the meeting. The purpose of the meeting was for the UCA to make an investment into both the partnership and corporation of **American Farmland Partners**. Before the UCA tendered his funds, **Dyer** explained another investment opportunity. **Dyer** stated to the UCA that **Dyer, Krumdick,** and Borst had started a new entity called **Agribusiness Investors Limited Partnership**. **Dyer** also told the UCA that "everything you read or see, I put it all together."

46.     During the meeting, the UCA provided $15,000 to **Hindman** in two checks, $10,000 as an investment in **American Farmland Limited Partnership** and $5,000 as an investment in **American Farmland Partners Corporation**. **Dyer** and **Krumdick** were also present in the room when the UCA gave the checks to **Hindman.** Below is a summarized portion of the UCA's conversation with **Hindman** and **Dyer** after the UCA had made those investments:

20

a) **Hindman** stated that the UCA would probably receive statements relating to the investments the UCA made. **Hindman** stated, "We'll probably do monthly but probably more, you know, maybe semi month, maybe twice a year, maybe quarterly."

b) The UCA asked **Hindman** if the funds the UCA gave him would be used for the investments and not used for any expenses. **Hindman** stated, "Right . . . but we have expenses you know." **Dyer** then stated, "Basically it is your (**Hindman's**) salary . . . I am paying for all the marketing." **Hindman** then stated to the UCA, "And we got some legal expenses and you know we have to pay out . . . some things to other investors." **Hindman** further stated that some of the UCA's funds would be used to pay his salary of $90,000 a year and there is "nobody else on the payroll."

c) **Hindman** told the UCA, "I have another office where I have my business . . . and that doesn't cost the company anything to use it . . . I mean I'll work out of there. This is just to meet people, you know."

d) The UCA asked **Dyer** what investment certificates **Hindman** would issue the UCA. **Dyer** replied, "When I do everything, I have it generated digitally. I do it on my own . . . I make a digital transmission; I have the watermarks on it; and I put it on a secure site so that I can keep track of what he's (**Hindman**) doing.

47.    At the meeting there was a discussion between **Hindman, Krumdick, Dyer,** W.C., and the UCA regarding how much land was acquired thus far and the current pool of capital. Below is a portion of that conversation:

| W.C.: | Who uh, what, what, what's the current, the current land base uh that you have together as far as investors are concerned? |
|---|---|
| Hindman: | Ahh, when you say land base what do you mean? |
| W.C.: | What's, what's the current number of acres? |

21

| Hindman: | None. |
|---|---|
| **W.C.:** | **Okay.** |
| Hindman: | We're just really, we're just really launched. We started launching, launching in November, December last year. So, the first things we gotta do is accumulate uh a lot of cash. |
| **W.C.:** | **And um, so then what's the, what's the current pool of capital and what do you feel that you need to have in order to be able to begin the acquisition?** |
| Hindman: | Well, I, I think we, we need to have uh, ten, $20 million to really get started. And I think we'll have, I think we'll have that in a couple months, we have it together in a couple of months. |
| **UCA:** | **How much do you have right now?** |
| Hindman: | Um, we've raised uh, seven, you know $700,000 from investors. |
| **UCA:** | **But like uh, Mr. Krumdick is invested $500,000 by himself, right? Okay. But that's not included in the $700,000 you're talking about, I'm, I'm a little confused.** |
| Hindman: | Um, well, it, it is, yes, in terms of what, you know the number's uh, and maybe the number's closer to $750,000, but no, that's uh, um that's included. |

48. On or about March 7, 2011, the UCA obtained negotiated copies of the two checks that the UCA had provided to **Hindman** on March 3, 2011. Those two checks had been deposited into Fifth Third Bank, Account xx-6491, with the business name of **American Farmland Partners**. It appears that **Hindman** had made at least one of these deposits in that, following the March 3, 2011 meeting, FBI and IRS agents followed **Hindman** from the meeting location to Fifth Third Bank located in Glen Ellyn, Illinois.

49. On April 12, 2011, the UCA received two certificates via Fedex relating to each of the UCA's investments on March 3, 2011. According to the Fedex shipping label and tracking information, the certificates were sent by **Nicholas Hindman** from Glen Ellyn, Illinois.

22

50.     On July 6, 2011, **Todd Dyer** emailed the UCA login information to enter a secure website, www.farmlandmarketing2.com, the site that **Dyer** had mentioned to the UCA during the March 3, 2011 meeting.   On July 7, 2011, the UCA downloaded information on that website including 162 "accredited investment questionnaires" filled out by various individuals across the United States.  Each questionnaire listed the potential investor's name, contact information, date of execution, and net worth/income.  Approximately 17 of the 162 names on the questionnaires (including the UCA's name) matched names of individuals who had deposited funds into bank accounts that were held by **Todd Dyer, Melvin Krumdick,** and/or **Nicholas Hindman** as detailed below.

51.     On July 28, 2011, the UCA met **Todd Dyer, Nicholas Hindman,** James Dyer, and **Tracy Bolton** at a restaurant in Lake Geneva, WI.  The UCA recorded the meeting.   **Todd Dyer** asked his father, James Dyer, to explain to the UCA "his background and how you're working with us." James Dyer stated that he was not involved with the enterprising venture however told the UCA, "As I said to **Todd** . . . I really like the concept, it's incredible . . . think it is great . . . you know, a really smart idea."  James Dyer further explained to the UCA that he has a background in estate planning and that "they just brought him in recently."   James Dyer told the UCA that he has been to three meetings with farmers and his role is to "overview some of the people that want to get involved and see if they're willing to have us do their work before they get involved uh, but to make sure that it's gonna be a match instead of a conflict."   James Dyer stated that he does own farmland.  The UCA asked if he invested into **Todd Dyer's** business.  James Dyer responded "you know when my kids hit 21 . . . .they make it or break it on their own, I don't want to be in a position if it wasn't for me you wouldn't have made it . . . I don't give advice unless they ask for it."   The UCA asked if any of the farmers that James Dyer met were any good. James Dyer told the UCA "the only thing that made them stop going for it immediately . . . is the actual physical structure and how things would function and operate, which is what they are working on now."

23

52.    The UCA then asked **Todd Dyer** and **Hindman** about recruiting more investors and below is a portion of the conversation:

UCA:              **Now have you guys gotten some more investors in to, to get the war chest up?**

Hindman:         Well not enough. We need help.

UCA:              **Cuz when we, when we met last time I think you said you were up to about $750,000 or something like that I mean?**

Hindman:         In total, in the beginning, yeah we (unintelligible) brought in a couple hundred since we saw you, we need, we need to reach out to professionals to help us. We're just not professional fundraisers (unintelligible).

UCA:              **Well I, yeah I'm, I'm interested I mean you know I gotta be honest with you though I've been you know a little disappointed on you know the paperwork I've received I not so much I mean I got the certificates but I haven't seen anything that really talks about where are we going, you know how close are we to, to investing, you know how much in assets do we have, how much um money do we have secured for debt and things like that. Um, there's, you know there's a lot of questions in my mind and okay well when, when is this thing really gonna go.... And I mean there's just been a lot of questions that haven't been answered.**

Hindman:         Well, have you asked me?

UCA:              **Yeah I sent, I sent you an email and I said well uh do you guys have a shareholder meeting coming up and stuff like that and I never heard anything back from you.**

Hindman:         Well we will, well we'll have one but where you know there's uh we typically have an inve-shareholder meeting at once a year and we haven't had that many shareholders so.

UCA:              **Okay.**

Hindman:         Something we just really haven't focused on.

UCA:              **Cuz, cuz I mean when, when you and I had talked originally um I had had a sense that I would get periodic kind of updates**

24

| Hindman: | on the investment and, and things that were going on and stuff and there really hasn't been anything.<br>There really hasn't been much happening (unintelligible). |

**Todd Dyer** also explained to the UCA that his business of **Borst Marketing Group** discussed on March 3, 2011 had been renamed to **Farmland Marketing Group.**

53.     On April 6, 2012, I conducted a Google Internet search linking the business of **Farmland Marketing Group** to the website www.farmlandmarketinggroup.com . The website lists the business address as 699 Walnut Street, Suite 400, Des Moines, IA with an email address of info@farmlandmarketinggroup.com.  The website states "**Farmland Marketing Group** is the leader in alternative funding options for farmers seeking liquidity" and has a separate linked webpage for Farmers, Investors, and Realtors.   The website also states "Over the last 4 years our firms marketing efforts have resulted in an impressive list of individual investors, institutions, university endowments, and others anxious to participate in farmland investment opportunities on passive basis."  I also reviewed the website of www.farmlandmarketinggroup2.com .  This website is also active and specifically states on the home page "Secure Area – Authorized Users Only."

**Tracy Bolton's opening of U.S. Growers Farmland Liquidity Fund, Inc. – the newest entity used in the scheme**

54.     On February 17, 2012, I received an email from State of Illinois, Secretary of State, Securities Department (IL-SOS) that was sent to them by an investor.  On February 16, 2012, **Tracy Lynn Bolton** with **Farmland Marketing Group** sent the investor a letter and a "formal offer to exchange" press release.  Bolton sent the message from the email address ycart22@gmail.com.   The email also stated ycart22@gmail.com was being used on behalf of **Tracy Bolton's** other email address of  Tracy@farmlandmarketinggroup.com.    The letter addressed from **Farmland Marketing Group** was from **Todd Dyer**.  It stated "your immediate attention regarding your investment in **Midwest Farmland Partners/American**

25

**Farmland Partners.** The following is a chronology of relevant events that should enable you to make an informed decision regarding the exchange of your securities in **American Farmland Partners** for options in **U.S. Growers Farmland Liquidity Fund, Inc.**" A few statements within the letter are summarized below:

a. In July of 2008, **Todd A Dyer, Melvin Krumdick,** and Mark Borst founded Midwest Farmland Partners.

b. In October of 2008 **Nicholas C. Hindman Sr.** was hired to run the day-to-day operations of the company based upon his farm background, CPA designation, experience running publicly traded companies.

c. In September of 2010, **Nicholas Hindman,** T.G. and P.J. created **American Farmland Partners** to replace **Midwest Farmland Partners** and bought out **Dyer, Krumdick,** and Borst.

d. **Dyer, Krumdick,** and Borst accepted warrants as payment for their concept and time and immediately transferred ownership of the warrants into a new entity, **Agri-Business Investors Partnership** which owns a number of agriculturally based businesses.

e. Following the buyout, **Dyer, Krumdick,** and Borst created a marketing organization called the **Farmland Marketing and Management Group** to promote **American Farmland Partners** at their own expense to ensure success of the fund.

f. **Hindman's** failure to act or provide periodic information that we believe he is morally obligated, if not legally obligated to provide, leaves us seriously concerned about the safety of ours and other investor deposits.

g. Previous investors of **Midwest Farmland Partners/American Farmland Partners** who make a minimum investment of $25,000 into the **U.S. Growers Farmland Liquidity Fund, Inc.** will have a "one time option" to convert their warrants, stock and/or partnership interests.

h. The State of Iowa has approved of the new entity and all of the appropriate filings have been made.

26

i. For more information or additional questions please contact **Todd Dyer**, President of **Farmland Marketing Group** or email us at info@farmlandmarketinggroup.com

The press release also stated that the exchange offer will be distributed only to holders of existing securities who complete and return a letter of eligibility. Holders of existing securities who desire a copy of the eligibility letter may contact **Tracy Lynn Bolton**, the information agent for the exchange offer.

55. Also on February 16, 2012, **Tracy Bolton** at ycart22@gmail.com sent the investor wiring instructions from for the **U.S. Growers Farmland Liquidity Fund, Inc.** bank account number xx-4643 located at Bank of America. The investor responded, in part, "**Tracy**, Please let **Todd** know that I was unaware that additional cash was going to be required to keep this thing going."

56. On February 21, 2012, I received an email from IL-SOS that was forwarded to them by an investor. The investor also stated within the email to IL-SOS "It appears they (referring to **Hindman** and **Dyer**) are 'fighting' over there fraudulent activity." The investor received an email from n.hind@sbcglobal.net (**Hindman**) stating "American Farmland Investor: You may have received a recent communication from **Todd Dyer** in which he is making an investment offer. **Todd** was bought out of any interest in our farming venture in December and has apparently decided to try to set up his own fund in violation of an agreement with us." The email also included a memo from **American Farmland Partners** signed by **Nicholas Hindman** dated February 19, 2012. The memo was in response to **Todd Dyer's** letter and press release dated February 16, 2012. A few statements from the memo are summarized below:

a. **Todd Dyer's** letter and press release contain materially false statements. His exchange offer is a fraud piece designed to extract more money for him.

27

b. **Todd** was never able to obtain sufficient confidence of any farmers to result in a consolidation of farmers, let alone acquire any farms.

c. The reason **American Farmland Partners**, was created was to distance the worthy concept from the stench that **Todd Dyer** had given **Midwest Farmland Partners** by his false statements, false promises, and diversions of funds received from investors intended for the partnership, but diverted to his own personal use.

d. **Todd Dyer's** statement that **Agri-Business Investors Partnership (AGIP)** owned a number of agriculturally based businesses needs verification. Mark Borst is not aware that **AGIP** had any such businesses.

e. **Todd Dyer's** assertion that **AGIP** created a marketing organization to promote **American Farmland Partners** at their own expense and to ensure its success is false. There is no marketing organization, just **Todd** and **Tracy**.

f. The exchange described by **Todd Dyer** is nothing more than a fraudulent scheme, to obtain $25,000 for a "one time option" to convert all investor equity in the farmland venture into a useless Iowa shell which will be controlled by a convicted con artist.

57.    On March 5, 2012, I received emails from IL-SOS that were forwarded to them by an investor. The investor was sent an email from n.hind@sbcglobal.net (**Hindman**) on February 29, 2012. **Hindman** stated in the email "I have AFPC (**American Farmland Partners Corporation**) legal and other expenses to pay and have exhausted my personal extra cash. If I put up my stock as collateral, give you some of my shares, and give you a personal guarantee, are you in a position to help me out temporarily?" **Hindman** then sent an email to him on March 3, 2012 and stated "….we must get some cash from other investors or this is over. IL-SOS wants a meeting a week from tomorrow and I believe we have a chance to settle this at that time. However, we need funds for the attorneys or they will no longer represent us. Any thoughts on which of the investors we can approach for funding? We need

28

to raise at least $50,000 and I would be willing to give up a large amount of stock to get this."

58.     On April 6, 2012, I searched the Iowa Secretary of State website for the business of **U.S. Growers Farmland Liquidity Fund, Inc.** The articles of incorporation for **U.S. Growers Farmland Liquidity Fund, Inc. filed January 8, 2012,** show that the corporation was created on January 6, 2012. The registered agent is **Tracy Lynn Bolton** at 699 Walnut Street, 4th Floor, Des Moines, Iowa (Regus virtual office). This same virtual office address is listed on the website www.farmlandmarketinggroup.com. **Tracy Lynn Bolton** is listed as sole incorporator with her home address of **31615 Tall Grass Court, Lakemoor, IL** and as Chairman of the Board of **U.S. Growers Farmland Liquidity Fund, Inc.** with address 699 Walnut Street, 4th Floor, Des Moines, Iowa.

59.     On May 3, 2012, I searched the Iowa Secretary of State website for the business of **Farmland Marketing and Management Group, Inc.** The articles of incorporation filed February 29, 2012, for **Farmland Marketing and Management Group, Inc.** show that the corporation was created on February 17, 2012. The registered agent is **Tracy Lynn Bolton** also at 699 Walnut Street, 4th Floor, Des Moines, Iowa. **Tracy Lynn Bolton** is listed as sole incorporator with her home address of **31615 Tall Grass Court, Lakemoor, Illinois** and as Chairman of the Board of **Farmland Marketing and Management Group, Inc.** with address 699 Walnut Street, 4th Floor, Des Moines, Iowa.

60.     On April 11, 2012 the UCA received an email from **Todd Dyer** using email address todd@farmlandmarketinggroup.com. The email indicated **Todd Dyer** was the Director of Marketing of **Farmland Marketing and Management Group, Inc** located at 699 Walnut Road, Ste 400, in Des Moines, Iowa. The email included an attached letter from **Dyer** that stated that **Farmland Marketing and Management Group, Inc.** is the "leader in alternative funding options for farmers seeking liquidity." **Farmland Marketing and Management Group, Inc.** "allows investors to invest in their land on a passive basis while giving the farmer the liquidity they need without

29

going into debt or losing control or possession of their farms." The letter further stated that there is a farm in Indiana and an individual farmland limited partnership has been structured to purchase the farm. There is a $10,000 minimum to purchase partnership interests and has a fixed annual priority interest rate component based upon the 10 year treasury rate. The letter also states the owner of the farm has not made a final decision regarding whether or not they will participate in the partnership.

61.     On April 13, 2012, **Tracy Bolton** emailed the UCA using email address info@farmlandmarketinggroup.com. **Tracy Bolton,** described as "Founder" stated in the email "The farmland partnership model has been validated in Canada and is now paying investors and 5% cash return after only 1 year of operations. The **Farmland Marketing and Management Group, Inc.** is now accepting investors in a similarly structured vehicle." **Tracy Bolton** also include the same letter that was sent to the UCA on April 11, 2012 by **Todd Dyer.**

62.     On April 28, 2012, **Tracy Bolton**, described as the "Founder of **Farmland Marketing and Management Group, Inc."** sent the UCA an email stating that "your offer to exchange is soon to expire and please see attached." **Bolton** sent the email using email address tracy@farmlandmarketinggroup.com. The attachment stated that as "investors of **Midwest Farmland Partners/American Farmland Partners**, you recently received an offer to exchange your securities in the aforementioned entities for the stock options of **U.S. Growers Farmland Liquidity Fund, Inc.** in a dollar for dollar exchange as described in previous e-mails. This offer is not valid for investor residing in the State of Illinois and this offer to exchange runs through Friday April 27, 2012." The attachment further stated that if you are interested in selling your securities, you will be required to mail any and all certificates and subscription materials to: **U.S. Growers Farmland Liquidity Fund, Inc.**, Attn: **Tracy Lynn Bolton** located at 699 Walnut Street, Suite 400, in Des Moines, Iowa.

30

63.     On April 20, 2012, **Tracy Bolton** sent the UCA a letter via email using email address info@farmlandmarketinggroup.com stating that "many of you have expressed an interest in converting your **American Farmland Partners** securities to those of the **U.S. Growers Farmland Liquidity Fund, Inc**. in the exchange offer." The UCA has never sent any correspondence to **Bolton** or **Dyer** expressing an interest in converting the UCA's securities. The letter further stated that "those interested would receive a penny per share, per partnership interest, per stock option or warrant for their securities in **Midwest Farmland Partners/American Farmland Partners**. This purchase although small, allows the investor to document the actual loss for the purposes of deducting a capital loss against current capital gains." The letter further stated that in order to participate in the exchange offer, funds must be received in the **U.S Growers** office by April 27, 2012. The investor was also was required to complete an exchange form at growersliquidityfund.com and required to wire a minimum of $25,000. The signature block of the email listed **Tracy Lynn Bolton,** Founder of **Farmland Marketing and Management Group, Inc** located at 699 Walnut Street, Suite 400, in Des Moines, Iowa. On April 25, 2012, **Todd Dyer** emailed the UCA similar information using email address todd@farmlandmarketinggroup.com.

64.     On April 25, 2012, **Tracy Bolton** emailed the UCA, using email address info@farmlandmarketinggroup.com asking the UCA "please indicate your intention to convert your **American Farmland Partners** securities for those in **U.S. Growers Farmland Liquidity Fund** or your intent to refuse the offer by completing the following: http://www.growersliquidityfund.com/exchange/." The signature block of the email listed **Tracy Lynn Bolton,** Founder of **Farmland Marketing and Management Group, Inc.**

**The bank records of Midwest Farmland Acquisitions Corporation and Midwest Farmland Management Corporation confirm that Dyer and others are operating a Ponzi scheme**

31

65.     I have analyzed records that I received from JP Morgan Chase Bank for accounts xx-5366 and xx-6605, which are held in the name of **Midwest Farmland Acquisitions Corporation** having a business address of **813 Kendall Lane, Lake Geneva, Wisconsin**. **Todd Dyer** opened a business checking and a business savings account on March 1, 2008, as President of the corporation. On August 27, 2008, **Melvin Krumdick** was added as Vice President and a signer to account xx-5366.    Bank statements were mailed to **813 Kendall Lane, Lake Geneva, Wisconsin** (Todd Dyer's) address) from account opening until November 29, 2008, and were then mailed to **1178 South Elmwood Avenue, Oak Park, Illinois** (**Krumdick's** address).    From March 2008 until June 2010, approximately $1,424,725 was deposited into these two accounts. I prepared a deposit analysis for these accounts that shows that $1,047,110 of the total deposits are from investors including:  $639,000 from Mark Borst; $153,000 from T.G.; $108,000 from  F.I.; $70,000 from P.J.; $41,110 from A.V. of IL (matched with accredited investor questionnaire -- one check includes the notation "45 Units Midwest Farmland" in the memo section); and $36,000 from S.L. of IL (matched with accredited investor questionnaire -- check includes notation "40 Units CLPIs" in memo section). **Hindman** mentioned to the UCA on November 10, 2010, that both T.G. and P.J. are "board members" and "have stock in the company." Approximately $75,000 of the investor funds were wire transferred into the accounts and another $972,110 was paid by check.   Some of the remaining deposits include: $168,685 in bank transfers; $52,725 in cash; $22,000 from **Midwest Farmland Management Corporation** (business owned by **Hindman)**; a $30,000 cashier's check from **Jadken LLC/Todd Dyer** from Peoples Bank; $15,392 in bank fees; and a $5,000 cashier's check from J.W. from First Banking Center. The account was closed in June 2010.

66.     I also analyzed the withdrawals from these two JP Morgan Chase accounts.   None of the money deposited into the account appears to have been used to acquire farmland, contrary to representations that **Dyer** had made to investors that their money would be used for that purpose. Specifically, from March 2008 through June 2010, more than $1.4 million was withdrawn from these

32

accounts. Less than 10 checks were written out of the checking account, xx-5366, and several of these were written to cash. Large sums of money were withdrawn on a monthly basis, sometimes totaling more than $100,000. Several withdrawals included the purchase of cashier's checks. A detailed withdrawal analysis shows the following: $207,080 in bank transfers; $177,008 paid to Mark Borst; $111,300 paid to **Midwest Farmland Management Corp** (business owned by **Hindman**); $52,000 paid to **Nicholas Hindman**; $101,500 paid to **Funding Structures Inc**; $71,000 paid to F.I.; $272,340 in cash/ATM withdrawals; $73,500 paid to **Melvin Krumdick**; $45,000 paid to G.H.; $19,000 transferred to **Midwest Farmland Acquisition Corp** (business owned by Mark Borst and **Melvin Krumdick**); $32,290 paid to investors from Illinois and Wisconsin; $16,500 paid to Arizona Vehicle Management (auto dealership); $15,290 paid to D&G Mainstreet LTD (also known as "Vegas Gentlemen's Club"); $6,105 paid to American Airlines; $5,000 paid to Farmeronly.com (singles/dating website); $2,500 paid to D.D. (**Todd Dyer's** uncle); and $1,500 paid to **Jadken LLC**. There were also numerous payments from the accounts, mostly paid by cashier's check, believed to be for advertising including $78,011 paid to ZooFX (Film, TV, and Commercial Production Resource); $8,500 paid to WFMT (classical radio station in Chicago); $5,000 paid to Miller and Brown Advertising; $4,740 paid to Choice Productions Inc.; and $4,253 paid to Sound Video Impressions. Thus, although investor funds were deposited into the accounts, none appear to have been used, at least directly, to acquire farmland or to be invested in any other manner.

**The deposit of proceeds of investment fraud scheme into JP Morgan Chase business checking Account #xx-1733**

67.    I analyzed records received from JP Morgan Chase regarding business checking account xx-1733 in the name of **Midwest Farmland Management Corporation**. **Nicholas Hindman** opened the account on August 26, 2008, with the title of President, showing a business address of 3333 Warrenville Road Suite 200, Lisle, Illinois (virtual office). From August 2008 through the last bank statement of October 2009, $209,738 was deposited into this account. A deposit analysis shows:

33

$60,000 of the total deposits were from investors – $50,000 from G. and A. V-V. from IL (matched with accredited investor questionnaire) and $10,000 from J.G. from WI (matched with accredited investor questionnaire). The majority of the other deposits were $113,800 from **Midwest Farmland Acquisition Corporation** (business owned by **Dyer** and **Krumdick)** and $19,945 in bank transfers. The majority of the withdrawals for the same time period consisted of the following: $98,053 paid to ADP Financial Services (believed to be for payroll); $34,000 paid to WFMT (Chicago classical radio station); $24,000 paid to **Midwest Farmland Acquisition Corporation** (business owned by **Dyer** and **Krumdick)**; $8,689 paid to **Nicholas Hindman**; $3,000 paid to ZooFX; $3,000 paid to G.H.; $2,267 paid to D.D.; and $400 paid to **Melvin Krumdick**. Thus, although investor funds were deposited into the account, none appear to have been used, at least directly, to acquire farmland or to be invested in any other manner.

**The deposit of proceeds of investment fraud scheme into Walworth State Bank business checking Account #xx-0924**

68.     I reviewed records received from Walworth State Bank business checking account xx-0924. The signature card shows that on April 26, 2010, **Todd Dyer** opened the account as President of **Midwest Farmland Acquisition Corporation** and was its sole signatory. The corporate account owner was listed as **Midwest Farmland Acquisition Corporation** located at **Todd Dyer's** residence, **813 Kendall Lane, Lake Geneva, Wisconsin.** From April 2010 through December 2010, approximately $137,215 was deposited into this account. A deposit analysis of the account shows the following, among other deposits: $3,800 in cash; and four deposits totaling $101,000 from three individuals whose names matched the names of individuals who filled out an accredited investor questionnaire. A withdrawal analysis of the account, among other withdrawals, shows the following: $26,977 in cash/ATM withdrawals; $9,665 paid to D&G Mainstreet LTD (Vegas Gentleman's Club) in 12 separate payments;  $3,250 paid to F.I., $6,000 paid to G.H.; $3,000 paid to **Jadken LLC**; $7,650 paid to J.H. (believed to be affiliated with Sycamore PD incident); $12,500 paid to **Nicholas Hindman**; $2,400 paid to S.L. (accredited

34

investor questionnaire match); $9,500 paid to Springfield Auto Sales (Borst); $12,253 paid to **Todd Dyer,** and $5,450 paid towards a car loan of **Todd Dyer**. Walworth State Bank closed this account in December 2010. Thus, although investor funds were deposited into the account, none appear to have been used, at least directly, to actually acquire farmland or to be invested in another manner.

### The deposit of proceeds of investment fraud scheme into Community Bank business checking Account #xx-0808

69.    I reviewed records from Community Bank business checking account xx-0808. The account was opened on September 17, 2010. The signature card shows that the account was a partnership account for Mark Borst and **Melvin Krumdick**. The business name on the account is **Agri-Business Investors** with an address of P.O. Box 24, in Springfield, Wisconsin. This is also the P.O. Box of Springfield Auto Sales, a business of Mark Borst. Beginning in September 2011, bank statements show its new address as P.O. Box 144, Springfield, Wisconsin. The partnership resolution of authority statement states that the agents of the business were Mark Borst, **Melvin Krumdick,** and **Todd Dyer**. Mark Borst and **Melvin Krumdick** were listed as general partners and had full signature authority over the account. **Todd Dyer** was authorized to conduct debit card transactions only. From September 2010 through February 2012, approximately $587,717 was deposited and withdrawn. A deposit analysis of the accounts shows the following deposits: $165,750 transferred from other businesses accounts of **Hindman** at Fifth Third Bank and JP Morgan Chase; $12,500 transferred from MJ Simon and Associates (a business of **Hindman's**); and eight deposits totaling $169,800 from individuals that matched the names of individuals who filled out an accredited investor questionnaire. There were three other wires deposited into this account, one for $75,000 from a doctor in New Jersey and two for $137,800 from an individual in Florida. These individuals did not have corresponding accredited investor questionnaires. However, both of these individuals also made deposits totaling $150,000 into account xx-9638, **American Farmland Partners** (business account of **Hindman**). A withdrawal analysis of the account, among other withdrawals, shows the following: $136,047 in cash/bank

Case 2:12-mj-00483-WEC   Filed 07/30/12   Page 40 of 70   Document 1

withdrawals; $115,575 paid to Mark Borst; $80,000 paid to **Todd Dyer**; $44,734 paid to Springfield Auto Sales (Borst's business); $37,500 paid to **Melvin Krumdick**; $26,337 paid to Paypal; $22,447 paid to D&G Mainstreet LTD/Vegas Gentleman's Club; $22,184 paid to Tracy Bolton/Paypal Ycart22 (office manager); $12,500 paid to M.M.R. Law Firm; $20,000 paid to W.C./CCI Marketing; and $1,500 paid to G.H. This account was closed February 1, 2012. Thus, although investor funds were deposited into the account, none appear to have been used, at least directly, to actually acquire farmland or to be invested in another manner.

## The deposit of proceeds of investment fraud scheme into Fifth Third Bank corporate Account #xx-6491

70. I analyzed bank records received from Fifth Third Bank for account xx-6491, a corporate account with a business name of **American Farmland Partners** opened by **Nicholas Hindman** on October 10, 2010. **Hindman** was the only signature holder on the account and the statement address was 3333 Warrenville Road Suite 200, Lisle, Illinois (virtual office). From January 2011 through May 2011, approximately $233,556 was deposited into the account. Five deposits totaling approximately $154,885 matched the names of individuals who filled out an accredited investor questionnaire. There also were two wire transfer deposits totaling $75,000 from New Jersey that did not have a matching questionnaire. However, they appeared to be related because the two individuals sending the wires have the same last name and one of wires states "for investment." It appears that $229,885 of the $232,698 in total funds deposited into the account in the above time frame was for investment purposes. I also prepared a withdrawal analysis of the account that shows the following withdrawals: $94,500 transferred to an **Agri-Business Investors** account (business account of Borst, **Krumdick**, and **Dyer**); $8,002 in cash/ATM withdrawals; $29,856 paid to Donna Hindman (**Nicholas Hindman's** wife); $46,500 in total paid to Infratel Acquisition Corporation and MJ Simon and Associates (both businesses of **Hindman's**); $13,375 paid to F.I.; $16,500 paid to G.H.; and $2,400 paid to S.L. with the notation "2010 return" in the memo section. S.L. filled out an accredited investment questionnaire; therefore it

36

appears the funds paid to S.L. were an "interest payment" on funds previously invested as indicated below. Thus, although investor funds were deposited into the account, none appear to have been used, at least directly, to actually acquire farmland or to be invested in another manner.

### Personal Account of Todd Dyer at Walworth State Bank Account #xx-2970

71.    I analyzed records received from Walworth State Bank. These records show that **Todd Dyer** at **813 Kendall Lane in Lake Geneva, Wisconsin,** opened a personal checking account #xx-2970 on April 26, 2010. From April 2010 to April 2012, approximately $205,343 was deposited and $203,511 was withdrawn from the account. The deposit analysis, among other deposits, shows the following: $11,313 in cash; $72,500 in cashier's checks payable to **Todd Dyer** from **Agri-Business Investors** (business account of Borst, **Krumdick**, and **Dyer** at Community Bank); a cashier's check of $12,500 payable to **Todd Dyer** from **American Farmland** (business account of **Hindman**); another $25,000 cashier's check from **Agri-Business Investors** payable to **Todd Dyer** purchased at Talmer Bank and Trust (believed to be from Mark Borst), $14,100 in bank transfers and money orders from **Midwest Farmland Acquisition Corporation** (business accounts of **Todd Dyer**), and $19,000 in cashier's checks and wires from **U.S. Growers Farmland Liquidity Fund, Inc.** (business account of **Tracy Bolton**).   The withdrawal analysis, among other withdrawals, from this account shows the following: $77,343 in checks written to cash/bank withdrawals; $15,900 paid to **Jadken LLC**; $15,789 paid on vehicle loans of **Todd Dyer** at Walworth State Bank; $8,100 paid to Triad Creative (marketing, exhibit, and signage service company); $7,500 paid to James Dyer; $7,806 paid to Walmart; $4,650 paid to D&G Mainstreet LTD (Vegas Gentleman Club); and $3,500 paid to K.N. (believed to be an attorney) with "J.W." in the memo section. One of the checks payable to cash was for $4,000 in February 2011 with "**Jadken** 1,500 / J Dyer 2,500" annotated in the memo section.

**The deposit of proceeds of investment fraud scheme into MB Financial Bank Account #xx-6300**

72.     I have analyzed bank records from MB Financial Bank, account number xx-6300. The records show that on October 13, 2010, **Nicholas Hindman** opened that corporate business checking account and was its only signature holder. The business name on the account was **American Farmland Partners Corporation.** The bank statements were mailed to 3333 Warrenville Road Suite 200, Lisle, Illinois. From October 13, 2010, through January 25, 2011, the total deposits and withdrawals were approximately $60,100. An analysis of the deposits shows two deposits totaling $40,000 from two individuals who filled out an accredited investor questionnaire.   The remaining deposits were $6,450 in cash, and $2,300 from Infratel Acquisition Corporation and $4,100 from MJ Simon and Associates (two businesses affiliated with **Hindman)**. An analysis of the withdrawals shows: $33,945 in checks to cash/bank withdrawals; $2,867 paid to Donna Hindman (**Hindman's** wife); $9,175 paid to Infratel Acquisition Corporation and MJ Simon and Associates (businesses affiliated with **Hindman)**; and $4,400 paid to G.H. Thus, although investor funds were deposited into the account, none appear to have been used, at least directly, to actually acquire farmland or to be invested in another manner.

**The deposit of proceeds of investment fraud scheme into JP Morgan Chase Bank Account #xx-9638**

73.     I analyzed records received from JP Morgan Chase Bank showing that on July 7, 2011, **Nicholas Hindman** opened a business checking account, xx-9638, in the name of **American Farmland Partners**. **Hindman** is listed as the President of **American Farmland Partners**.    Between July 2011 and March 2012, more than $216,000 was deposited and withdrawn, with the majority of the transactions occurring in July 2011.   There was minimal activity within the business checking account from August 2011 to March 2012.  A deposit analysis for July 2011 shows the following:  a $50,000 wire transfer from an individual in New Jersey and a $100,000 check from an individual in Florida. Both of these individuals also wire transferred $75,000 (individual from New Jersey) in July 2011 and $137,800

(individual from Florida) in August and September 2011 into the **Agri-Business Investors** (business account of Borst, **Krumdick**, and **Dyer)**. There were two other deposits during July 2011 for $65,000. The $65,000 deposit consisted of two checks from a couple from Missouri, one check was annotated for "limited partnership" and the other check was annotated for "common stock." A withdrawal analysis from July 2011 through March 2012 shows: $71,250 transferred to **Agri-Business Investors;** $86,200 transferred to MJ Simon Associates account (**Hindman's** business), $12,250 paid to G.H.; $10,000 was withdrawn in cash, $10,000 paid to J.G. (matching investor questionnaire), $10,000 paid to T.O. (unknown purpose); and $7,467 paid to Donna Hindman (**Hindman's** wife). The remaining withdrawals were for miscellaneous expenses such as hotel, airfare, car rental, and virtual office fees. Thus, although investor funds were deposited into the account, none appear to have been used, at least directly, to actually acquire farmland or to be invested in another manner.

### The deposit of proceeds of investment fraud scheme into Bank of America Bank Account #xx-4643

74. I obtained and analyzed records from Bank of America regarding the account of **U.S. Growers Farmland Liquidity Fund, Inc.,** account # xx-4643. **Tracy Lynn Bolton,** using the title of "Chairman of the Board," opened this account as a business checking account on January 19, 2012. For the month of February 2012, $50,000 was deposited and $46,338.48 was withdrawn from the account. The deposits consisted of two wires of $25,000 each. One wire was sent by a doctor from New Jersey who also wired funds totaling $125,000 into the accounts of **Agri Business Investors (Dyer/Krumdick/Borst)** and **American Farmland Partners (Hindman)**. The second deposit was a transfer of funds from an unnamed individual from The Villages, Florida. This individual is believed to be the same individual also from The Villages, Florida who wired funds totaling $237,800 into the accounts of **Agri Business Investors (Dyer/Krumdick/Borst)** and **American Farmland Partners (Hindman)**. A withdrawal analysis showed the following: $14,000 was wired into an account of **Tracy Lynn Bolton** at Fifth Third Bank, $9,000 was wired

into account xx-2970 of **Todd Dyer** at Walworth State Bank, a cashier's check made payable to **Todd Dyer** for $10,000, a cashier's check made payable to **Tracy Bolton** for $9,000, and $4,000 was withdrawn in cash. The remaining withdrawals were two payments to GoDaddy.com of $173.08 and $83.40 and $62 in wire transfer fees. Thus, although investor funds were deposited into the account, none appear to have been used, at least directly, to actually acquire farmland or to be invested in another manner.

### The opening of accounts xx-1328 and xx-1302 at U.S. Bank to continue the investment fraud scheme

75. I obtained and analyzed records from US Bank National Association regarding the account of **U.S. Growers Farmland Liquidity Fund, Inc.,** account # xx-1328. The signature card states the type of business is Agricultural Marketing and has been in operation for 2 months. **Tracy Bolton** opened this account as a business checking account on March 20, 2012, using address 699 Walnut Street, Suite 400, Des Moines, Iowa. The only activity that occurred in the account during March 2012 was a $100 initial deposit. Additional bank documentation has been requested, however has not been received.

76. I obtained and analyzed records from US Bank National Association regarding the account of **Farmland Marketing and Management Group, Inc.,** account # xx-1302. **Tracy Bolton** also opened this account as a business checking account on March 20, 2012, using address 699 Walnut Street, Des Moines, Iowa. The signature card states the type of business is Agricultural Marketing and has been in operation for 2 months. There was minimal activity that occurred in the account during March 2012, $1,400 was deposited and $1,100 was withdrawn. Additional bank documentation has been requested, however has not been received.

77. From March 2008 through February 2012, more than $2 million of investor funds were deposited into accounts that were held by **Todd Dyer, Melvin**

40

**Krumdick, Nicholas Hindman,** or **Tracy Bolton,** or a combination of the four individuals. These funds are being withdrawn as quickly as they are being deposited. No information within the analyzed bank accounts shows that any farmland has ever been purchased. Investor funds are being used to pay "interest payments" to other investors, personal expenses of the named individuals, and business expenses to continue the promotion of the scheme. Almost all of the investor funds have been deposited into the below bank accounts:

**Bank Account Summary**

| Bank | Business | Signatories | Time Frame | Amount |
|------|----------|-------------|------------|--------|
| JP Morgan Chase xx-5366 | Midwest Farm. Ac. Corp. | Dyer Krumdick | 3/08 – 11/09 | $676,110 |
| JP Morgan Chase xx-6605 | Midwest Farm. Ac. Corp. | Dyer Krumdick | 2/09 – 2/10 | $371,000 |
| JP Morgan Chase xx-1733 | Midwest Farm. Manage. Corp. | Hindman | 4/09 – 8/09 | $60,000 |
| MB Fin. Bank xx-6300 | Midwest Farm. Partners Corp. | Hindman | 10/10 – 12/10 | $40,000 |
| Walworth State Bank xx-0924 | Midwest Farm. Ac. Corp. | Dyer | 4/10 – 8/10 | $101,000 |
| MB Fin. Bank xx-6300 | American Farm. Partners Corp. | Hindman | 10/10 – 12/10 | $40,000 |
| Fifth Third Bank xx-6491 | American Farm. Partners | Hindman | 1/11 – 3/11 | $229,885 |
| Community Bank xx-0808 | Agri-Business Investors (Partnership) | Borst Krumdick Dyer | 10/10 – 9/11 | $382,600 |
| JP Morgan Chase xx-9638 | American Farm. Partners | Hindman | 7/11 | $215,000 |
| Bank of America xx-4643 | U.S. Growers Farmland Liquidity Fund | Bolton | 2/12 | $50,000 |

**Records and information relating to the "virtual offices" being used within the scheme**

78. I analyzed records from Regus, the virtual office located at 3333 Warrenville Road, Suite 200, in Lisle, Illinois. The virtual office agreement dated

41

November 18, 2010, listed **Midwest Farmland/American Farmland Partners** as the client with **Nicholas Hindman** of 95 Brandon Avenue, Glen Ellyn, Illinois (home address of **Hindman**) as the contact name. The type of service listed in the agreement was "mailbox plus" with a monthly fee of $119. The services allow the client to receive mail and faxes and use a telephone answering service. **Nicholas Hindman** and **Allen Todd Dyer** were authorized to receive mail at the location. **American Farmland/Midwest Farmland** showed a business address of **6070 State Route 53, Suite B, in Lisle, Illinois**. The type of business was listed as "Farm Management." There were two invoices for services rendered in November 2010 and December 2010 addressed to **Midwest Farmland/American Farmland Partners** to the attention of **Nicholas Hindman** with an address of 95 Brandon Avenue, Glen Ellyn, Illinois. On July 25, 2011, (19 days after issuance of the Illinois Secretary of State Order) **Nicholas Hindman** sent an email to Regus requesting a virtual office address change from Lisle, Illinois to Milwaukee, Wisconsin. The virtual office agreement as of July 25, 2011, listed 250 East Wisconsin Avenue, 18th Floor, Milwaukee, Wisconsin, as the new business center address.

79.   I analyzed records from Regus, the virtual office located at 699 Walnut Street, Suite 400, Des Moines, Iowa. The virtual office agreement for **U.S. Growers Farmland Liquidity Fund, Inc.** dated January 9, 2012, listed **Tracy Bolton** as the contact using an address of **31615 Tall Grass Court, Lakemoor, Illinois** and email tracy@farmlandmarketinggroup.com. The type of service listed in the agreement was "mailbox plus" with an initial payment of $163 and a monthly fee of $69 thereafter. The service start was scheduled to begin on January 15, 2012 and end on January 31, 2013. The virtual office agreement for **Farmland Marketing and Management Group, Inc.,** dated March 1, 2012, listed **Tracy Bolton** as the contact using an address of PO Box 144, Springfield, Wisconsin and email ycart22@gmail.com. The type of service listed in the agreement was "mailbox plus" with an initial fee of $58 and $29 monthly fee thereafter. The service start was scheduled to begin on March 1, 2012 and end on January 31, 2013.

42

**Illinois Secretary of State's July 2011 Temporary Order of Prohibition barring Dyer, Hindman, and Krumdick from offering or selling securities**

80.     On July 6, 2011, a Temporary Order of Prohibition was issued by the State of Illinois, Secretary of State Securities Department, prohibiting the offering or selling of securities by **Todd Dyer**, **Nicholas Hindman**, **Mel Krumdick,** and Mark Borst in or from the State of Illinois.   The order was based on the following allegations: Count 1 - Failure to Register Securities; Count 2 – Fraud; Count 3 – Unregistered Dealer/Salesperson; and Count 4 – Violation of Order of Prohibition. The order states that the respondents engaged in a scheme in which they took investor money on the premise that the money would be used to purchase farmland but that the respondents failed to invest in farmland and used investor money for personal use.  The order also states that in 2000, **Todd Dyer** had previously been issued an Order of Prohibition by the Illinois Secretary of State Securities Department prohibiting him from offering or selling securities.  On December 22, 2011, the State of Illinois, Secretary of State Securities Department served a deposition subpoena on **Melvin Krumdick**.   On December 27, 2011, they also served a deposition subpoena on **Todd Dyer**.  **Krumdick** and **Dyer** were required to testify on January 11, 2012, and January 18, 2012, respectively.  Neither **Krumdick** nor **Dyer** appeared at the hearings and both filed motions to quash the subpoenas.

81.     I received accounting records from Illinois Secretary of State Securities Department (IL-SOS) that were provided by **Nicholas Hindman**.  In exchange for IL-SOS reducing the counts against him, **Nicholas Hindman** agreed to cooperate.  As part of **Hindman's** cooperation, he provided QuickBook records for 2008 through 2012.  I received these records from IL-SOS between January 2012 and February 2012.  **Hindman** provided QuickBook records regarding his three entities: **Midwest Farmland Limited Partnership, Midwest Farmland Management Corporation,** and **American Farmland Partners Corporation**. These records included a balance sheet, a profit and loss statement, and a general ledger for each business. Most of the transactions for **Midwest Farmland Limited Partnership** and **Midwest Farmland Management Corporation** documented with QuickBooks correspond

43

with actual bank transactions. These records also show funds totaling $60,000 from two investors. The two investors are listed on the 2009 **Midwest Farmland Limited Partnership** balance sheet as having "equity" in the business. However their funds were deposited into the bank account of **Midwest Farmland Management Corporation.** I also analyzed the QuickBook records of **American Farmland Partners Corporation.** The general ledger dated for February 2012 lists three of **Hindman's** business bank accounts noted above: JP Morgan Chase (xx-1733), Fifth Third Bank (xx-6491), and MB Financial (xx-6300). The details of these accounts do not list all of the transactions that actually occurred within each bank account. In addition, deposits notated as "SPLIT" deposits are from investors and are not accurate in that only half or less is recorded in the QuickBook records as compared to what was deposited in the bank. This includes 11 deposits into bank accounts that actually totaled $434,885. Whereas, **Hindman's** QuickBook general ledger for the bank accounts reflects deposits totalling only $192,500 for these same transactions.

82.    On April 3, 2012, **Todd Dyer** sent an email to the UCA (along with other undisclosed recipients) in regards to the "State of Illinois, Secretary of State, Securities Department (IL-SOS) case and the status of your investment." **Dyer** stated that the IL-SOS case and the Temporary Order of Prohibition issued by them are an "exaggeration and manipulation of the facts." **Dyer** further stated "**Hindman** will not be resolving the matter before IL-SOS as he is without funding. **Hindman** has in fact moved on leaving investors without information." Dyer advised "an offer to exchange is being made by another entity not owned or controlled by Borst, **Krumdick,** or **Dyer** and is being done...in attempt to give investors an opportunity to salvage their investment." This entity Dyer is advising is believed to be **U.S. Growers Farmland Liquidity Fund, Inc.** controlled and operated by **Tracy Bolton** as stated above. **Dyer** further stated "if you decide against this opportunity to exchange, your response or lack of response will be documented to prevent a request to participate at a later date. Any attempt to hinder the progress of this new entity or attempt to damage its credibility may result in legal action. We apologize

44

for any inconvenience but - this offer is not currently available to residents of the State of Illinois." The signature line of the email stated **Todd Dyer,** Director of Marketing, **Farmland Marketing and Management Group, Inc** with email address todd@farmlandmarketinggroup.com and address 699 Walnut Street, Suite 400, Des Moines, Iowa.

82A.    On May 17, 2012, Enforcement Attorney Mary Lopez sent me a "Motion For Sanctions" filed by **Todd Dyer** pro se on May 16, 2012, requesting that the hearing examiner assigned to the above litigation assess sanctions against the State of Illinois, Secretary of State, Securities Department, for the SOS's failure to respond to **Dyer's** discovery demands. The motion includes an attack on the credibility of **Dyer's** former girlfriend, J.W., whom he claims, in the motion, cooperated with federal authorities in an investigation related to that of the SOS's investigation. In support of his attack on J.W.'s credibility, **Dyer** attached to his motion, as Exhibit 7, an undated letter from J.W. to **Dyer** that stated as follows:

> "Dear Todd:    This letter is to confirm our recent phone conversation of December 4, 2010.  I told you that I had been talking to investigators about you recently and that I had done so in anger and as retaliation for you stopping my 'child care' privileges while in the Huber Dorm at Walworth County Jail. I am admitting now by signing this letter that the things that I told them are untrue and that I did those things out of anger, frustration and desperation.    I am also admitting that you did not abuse me and that you treated me well and took care of me for the last 6 years.  The things that I said about you are not true.  I am sorry.  Love Always (sic), J.W. [full name stated]"

82B.    On May 25, 2012, I met with J.W. and showed her the above letter. She stated that the letter bore her signature, that **Dyer** had typed the letter and presented

45

it to her to sign, that she did not read the letter, and that she was under the influence of cocaine when she signed the letter. She told me that the statements that she gave to FBI agent Michael Johnson and me on December 3, 2010, were truthful.

82C.   Additionally, I have read sworn statements that J.W. made on December 21, 2010, and March 15, 2011 in connection with this federal investigation. Those sworn statements are substantially consistent with her previous statements to law enforcement authorities, including Michael Johnson and me.

## IV. Premise Search Warrants

<u>Todd Dyer's Residence</u>

83.   The United States Postal Inspection Service monitored mail delivered to **813 Kendall Lane, Lake Geneva, Wisconsin** from September 13, 2010, to October 12, 2010. During the monitoring, the following mailings were notable: three pieces of first class mail addressed to **Todd Dyer**, one piece of first class mail addressed to **Todd Dyer** and Joette Dyer, one piece of first class mail addressed to J.W. and **Todd Dyer**, and one piece of first class mail from Dun and Bradstreet addressed to **Todd Dyer** and **Midwest Farmland Acquisitions**.

84.   The United States Postal Inspection Service monitored mail delivered to **813 Kendall Lane, Lake Geneva, Wisconsin** from June 11, 2011, to July 10, 2011. During the monitoring, the following mailings were notable: one piece of first-class mail from the Internal Revenue Service addressed to **Funding Structures Corporation**, nine pieces of first class mail addressed to **Todd Dyer**, and one piece of first class mail addressed to **Farmland Marketing Group**. In addition, there was a copy of a letter sent to the United Post Office from Tracy Bolton of **Farmland Marketing Group** dated June 17, 2011 that stated "The only business working out of **813 Kendall Lane, Lake Geneva, WI** is **Farmland Marketing Group**."

46

85.    On May 1, 2012, I faxed an Address Verification Request to the United States Post Office in Lake Geneva, Wisconsin. On May 3, 2012, the Lake Geneva Post Office confirmed that mail is currently being delivered to **Todd Dyer** at **813 Kendall Lane in Lake Geneva, Wisconsin.**

Melvin Krumdick's Residence

86.    The United States Postal Inspection Service monitored mail delivered to **1178 South Elmwood Avenue, Oak Park, Illinois,** from August 31, 201,0 to September 29, 2010. During the monitoring, the following mailings were notable: one piece of mail from Palm Springs Volvo Subaru addressed to both **Todd Dyer** and **Midwest Farmland Acquisition Corporation**, one piece of mail from ATERSO01 addressed to **Midwest Farmland Acquisitions**, two pieces of first-class mail from Bank of America, one item from the Illinois Secretary of State addressed to Green Opportunities Inc, four pieces of first class-mail from Chase Bank addressed to **Midwest Farmland Acquisition Corporation** or **Midwest Farmland Acquisitions,** and approximately forty-four pieces of first-class mail addressed to **Melvin Krumdick, Rev. Mel Krumdick,** or **Father Mel Krumdick**.

87.    The United States Postal Inspection Service monitored mail addressed to the residence at **1178 South Elmwood Avenue, Oak Park, Illinois** from June 6, 2011 to July 5, 2011. During the monitoring, the following mailings were notable: one piece of first-class mail from the Wisconsin Department of Revenue addressed to both **Melvin Krumdick** and **Midwest Farmland Acquisitions Corporation**, and approximately sixty-nine pieces of first-class mail addressed to **Melvin Krumdick, Rev. Mel Krumdick,** or **Father Mel Krumdick.**

88.    On May 7, 2012, I faxed an Address Verification Request to the United States Post Office in Oak Park, Illinois. That same day, the Oak Park South Post Office confirmed that mail is currently being delivered to Melvin Krumdick at 1178 South Elmwood Avenue, in Oak Park, Illinois.

47

Tracy Bolton's Residence

89. The United States Postal Inspection Service monitored mail delivered to **31615 Tall Grass Court, Lakemoor, Illinois** from March 21, 2012 to April 19, 2012. During the monitoring, the following mailings were notable: one piece of first-class mail from U.S. Bank addressed to **Tracy Bolton** and **US Growers Farmland Liquidity Fund Inc.**, one piece of first-class mail from U.S. Bank addressed to **Tracy Bolton** and **Farmland Marketing and Management Group**, two pieces of first-class mail from Regus (virtual office in Iowa) addressed to **Tracy L. Bolton** and **US Growers Farmland Liquidity Fund Inc.**, one piece of first-class mail from Regus (virtual office in Iowa) addressed to **US Growers Farmland** and one piece of first-class mail from Electronic Federal Tax Payment System addressed to **Farmland Marketing and Management Group Inc.**

## V. Computers and Electronic Devices Search Warrants

90. As described above and in Attachment A, C, and E, this application seeks permission to search and seize records that might be found at the premises I am requesting be searched, in whatever form they are found. I submit that if a computer or electronic medium is found on the premises, there is probable cause to believe those records will be stored in that computer or electronic media, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using readily-available forensics tools. This is so because when a person "deletes" a file on a home computer, the data

48

contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the hard drive that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Similarly, files that have been viewed via the Internet are typically automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

d.     Based on actual inspection of emails associated with **Todd Dyer, Melvin Krumdick, Nicholas Hindman, and Tracy Bolton,** I am aware that computer equipment was used to generate, store, and print documents used in the above-described scheme. There is reason to believe that there is a computer system currently located at each of the following addresses:

1. **813 Kendall Lane, Lake Geneva, Wisconsin**
2. **1178 South Elmwood Avenue, Oak Park, Illinois**
3. **31615 Tall Grass Court, Lakemoor, Illinois**

e.     In the event that more than just the targets of this search share a particular location as a residence, it is possible that the particular location will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If agents conducting the search nonetheless determine that it is possible that the things described in this warrant could be found on those computers, this application seeks permission to search and if necessary to seize those computers as well. It may be

49

impossible to determine, on scene, which computers contain the things described in this warrant.

91. Based upon my knowledge, training and experience, I know that searching for information stored in computers often requires agents to seize most or all electronic storage devices to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is often necessary to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine those storage devices in a laboratory setting, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the laboratory setting. This is true because of the following:

a. The volume of evidence. Computer storage devices (like hard disks or CD-ROMs) can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b. Technical requirements. Searching computer systems for criminal evidence sometimes requires highly technical processes requiring expert skill and properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction

50

(both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis.

c. In light of these concerns, I hereby request the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

d. Searching computer systems for the evidence described in Attachments A1, C1, and E1 may require a range of data analysis techniques. In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide files and directories, encode communications to avoid using key words, attempt to delete files to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or peruse every file briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, I intend to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachments A1, C1, and E1.

## VI. Web Site Search Warrants

92. On April 5, 2012, I completed a WHOIS search to find the registrant for the domains **FARMLANDMARKETINGGROUP.COM** and

51

**FARMLANDMARKETINGGROUP2.COM**. The WHOIS database is a searchable list of every single domain currently registered in the world. According to information found on the website Godaddy.com, LLC, the Internet Corporation of Assigned Names and Numbers (ICANN) requires accredited registrars like GoDaddy.com, LLC to publish registrant's contact information, domain creation and expiration dates and other information in the WHOIS listing as soon as a domain is registered. A result of this search, I found that the registrant for the both domains is **Farmland Marketing Group**, P.O. Box 24, Springfield, WI (same address used on the **Agri-Business Investors** account at Community Bank). The first domain was created on March 10, 2011, and expires on March 10, 2014, and the second was created March 19, 2011, and expires March 19, 2014. Currently, the administrative and technical contact for both domains is **Todd Dyer** at P.O. Box 24, Springfield, WI, with an email address of FarmlandMarketing@gmail.com. The registration service provider of both domains was **GoDaddy.com, LLC**.

93.    On April 6, 2012, I conducted a Google Internet search linking the business of **Farmland Marketing Group** to the website www.farmlandmarketinggroup.com . The website lists the business address as 699 Walnut Street, Suite 400, Des Moines, Iowa, the address of a virtual office, with an email address of info@farmlandmarketinggroup.com.

94.    I also reviewed the website of www.farmlandmarketinggroup2.com on April 6, 2012. This website is also active and specifically states on the home page "Secure Area – Authorized Users Only." This is the same website that UCA received login and password information from **Todd Dyer** on July 6, 2011. On July 7, 2011, the UCA downloaded information on that website including 162 "accredited investment questionnaires," of which approximately 17 matched names of individuals who had deposited funds into above bank accounts.

95.    On May 10, 2012, and pursuant to 18 USC Section 2703(f), I submitted a request to **GoDaddy.com, LLC** asking **GoDaddy.com, LLC** to preserve records and

52

other evidence in its possession pertaining to www.farmlandmarketingroup.com and www.farmlandmarketinggroup2.com for a period of 90 days pending the issuance of a court order for those records.

96. On May 1, 2012, I conducted a Google internet search linking the business of **U.S. Growers Liquidity Fund, Inc.** to website growersliquidityfund.com. The website lists the business address as 699 Walnut Street, Suite 400, Des Moines, Iowa, the address of a virtual office, with an email address of info@growersliquidityfund.com.

97. On May 3, 2012, I then completed a WHOIS search to find the registrant for the domain named growersliquidityfund.com to determine the contact information. The registrant for domain name growersliquidityfund.com is **GoDaddy.com, LLC.**

98. On May 3, 2012, and pursuant to 18 USC Section 2703(f), I submitted a request to **GoDaddy.com, LLC** asking **GoDaddy.com, LLC** to preserve records and other evidence in its possession pertaining to growersliquidityfund.com for a period of 90 days pending the issuance of a court order for those records. On May 10, 2012, a representative of **GoDaddy.com, LLC** confirmed that records related to growersliquidityfund.com were being maintained on its system and would be preserved for ninety (90) days.

99. On May 14, 2012, I reviewed records received from **GoDaddy.com, LLC.** The records indicate that, in addition to the domains farmlandmarketingroup.com farmlandmarketinggroup2.com, and growersliquidityfund.com, there were several other domains registered by **Todd Dyer, Tracy Bolton**, or **Nicholas Hindman**. The domains all appear to be related to the investment scheme and are listed below:

      a. **AMERICANFARMLANDPARTNERS.NET**

      b. **AMERICANFARMLANDPARTNERS.MOBI**

c. AMERICANFARMLANDPARTNERS.INFO

d. AMERICANFARMLANDPARTNERS.ORG

e. AMERICANFARMLANDPARTNERS.ME

f. AMERICANFARMLANDPARTNERS.CA

g. AMERICANFARMLANDPARTNERSSTORE.COM

h. AMERICANFARMLANDPARTNERS.BIZ

i. AMERICANFARMLANDPARTNERS.US

j. THEAMERICANFARMLANDPARTNERS.COM

k. AMERICANFARMLANDPARTNERS.COM

l. AMERICANFARMLANDPARTNERS.TV

m. THEAGRICULTURALNETWORK.COM

n. MIDWESTFARMLANDPARTNERS.COM

o. MIDWESTFARMLANDPARTNERS2.COM

p. FARMERSUNITE.COM

q. TRACYLYNNBOLTONAGRICULTURE.COM

r. TODDDYERAGRICULTURE.COM

Subpoenaed records also indicate that **Tracy Bolton** has two online storage accounts with **GoDaddy.com, LLC,** a 100 GB in online storage with an account name of **TracyLynn** and 1 GB in online storage with an account name of tracy@farmlandmarketinggroup.com.   The 100GB online storage account was billed to **Tracy Bolton** and **U.S. Growers Farmland Liquidity Fund, Inc.** at **699 Walnut Street, 4th Floor,** in **Des Moines, Iowa** with email address tracy@farmlandmarketinggroup.com on February 14, 2012 for $83.40.  The 1GB online storage account along with email and calendar services was billed to **Tracy Bolton** and **Farmland Marketing Group** at **699 Walnut Street, 4th Floor,** in **Des Moines, Iowa** with email address todd@farmlandmarketinggroup.com on April 12, 2012 for $38.28.  Records show **Tracy Bolton** paid for these services on or about the same day they were billed using a credit card associated with **Bank of America Bank Account #xx-4643** indicated above.

54

100. On May 15, 2012 and pursuant to 18 USC Section 2703(f), I submitted a request to **GoDaddy.com, LLC** asking **GoDaddy.com, LLC** to preserve records and other evidence in its possession pertaining to all the domains listed in paragraph 99, subsection (a) through (r), and the two online storage accounts of **Tracy Bolton** for a period of 90 days pending the issuance of a court order for those records..

101. Web hosting companies, such as **GoDaddy.com, LLC**, maintain server computers connected to the Internet. Their customers use those computers to operate websites on the Internet.

102. In general, web hosting companies like **GoDaddy.com, LLC** ask each of their customers to provide certain personal identifying information when registering for an account. This information can include the customer's full name, physical address, telephone number and other identifiers, e-mail addresses, and business information. Web hosting companies also may retain records of the length of service (including start date) and types of services utilized. In addition, for paying customers, web hosting companies typically retain information about the customers' means and source of payment for services (including any credit card or bank account number).

103. Web hosting companies' customers place files, software code, databases, and other data on the servers. To do this, customers connect from their own computers to the server computers across the Internet. This connection can occur in several ways. In some situations, it is possible for a customer to upload files using a special web site interface offered by the web hosting company. It is frequently also possible for the customer to directly access the server computer through the Secure Shell ("SSH") or Telnet protocols. These protocols allow remote users to type commands to the web server. The SSH protocol can also be used to copy files to the server. Customers can also upload files through a different protocol, known as File Transfer Protocol ("FTP"). Servers often maintain logs of SSH, Telnet, and FTP connections, showing the dates and times of the connections, the method of connecting, and the Internet Protocol addresses ("IP addresses") of

55

the remote users' computers (IP addresses are used to identify computers connected to the Internet). Servers also commonly log the port number associated with the connection. Port numbers assist computers in determining how to interpret incoming and outgoing data. For example, SSH, Telnet, and FTP are generally assigned to different ports.

104. The servers use those files, software code, databases, and other data to respond to requests from Internet users for pages or other resources from the website. Commonly used terms to describe types of files sent by a server include HyperText Markup Language ("HTML") (a markup language for web content), Cascading Style Sheets ("CSS") (a language for styling web content), JavaScript (a programming language for code run on the client's browser), and image files. Web hosting companies frequently allow their customers to store collections of data in databases. Software running on the web server maintains those databases. Two common such programs are named MySQL and PostgreSQL, although these are not the only ones.

105. Web hosting companies sometimes also provide their customers with e-mail accounts; contents of those accounts are also stored on the web hosting company's servers.

106. Web sites deliver their content to users through the Hypertext Transfer Protocol ("HTTP"). Every request for a page, image file, or other resource is made through an HTTP request between the client and the server. The server sometimes keeps a log of all of these HTTP requests that shows the client's IP address, the file or resource requested, the date and time of the request, and other related information, such as the type of Web browser the client uses.

107. Web sites are often known to the outside world by a domain name, such as www.uscourts.gov or www.amazon.com. Domain names must be registered to particular individuals. Sometimes, web hosting companies offer customers the separate service of registering domain names. When that occurs, web hosting companies typically retain information related to the domain name, including the

56

date on which the domain was registered, the domain name itself, contact and billing information for the person or entity who registered the domain, administrative and technical contacts for the domain, and the method of payment tendered to secure and register the domain name.

108.   In some cases, a subscriber or user will communicate directly with a web hosting company about issues relating to a website or account, such as technical problems, billing inquiries, or complaints from other users. Web hosting companies typically retain records about such communications, including records of contacts between the user and the company's support services, as well records of any actions taken by the company or user as a result of the communications.

109.   I anticipate executing the warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require **Godaddy.com, LLC** to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment F1. Upon receipt of the information described in Section I of Attachment F1, government-authorized persons will review that information to locate the items described in Section II of Attachment F1.

110.   This Court has jurisdiction to issue the requested warrant because it is "a court with jurisdiction over the offense under investigation." 18 U.S.C. § 2703(a).

111.   Pursuant to 18 U.S.C. 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## VII. Email Search Warrants

112.   On April 5, 2012, I completed a WHOIS search to find the registrant for the domain named farmlandmarkertinggroup.com to determine the contact

57

information of the entity hosting the email addresses
todd@farmlandmarketinggroup.com, tracy@farmlandmarketinggroup.com, and
info@farmlandmarketinggroup.com. I found that the registrant is **GoDaddy.com,
LLC.**

113. For the period of April 14, 2011, through April 3, 2012, the UCA agent
received and sent multiple email correspondence to or from the following email
addresses:

   a. todd@farmlandmarketinggroup.com (**Todd Dyer**)

   b. tracy@farmlandmarketinggroup.com (**Tracy Bolton**)

   c. info@farmlandmarketinggroup.com

114. On May 10, 2012, and pursuant to 18 USC Section 2703(f), I submitted a
request to **GoDaddy.com, LLC** asking **GoDaddy.com, LLC** to preserve records
and other evidence in its possession pertaining to:
todd@farmlandmarketinggroup.com, tracy@farmlandmarketinggroup.com, and
info@farmlandmarketinggroup.com for a period of 90 days pending the issuance of
a court order for those records.

115. On May 14, 2012, I reviewed records received from **GoDaddy.com,
LLC.** The records indicated in addition to the email addresses indicated in
paragraph 114, there were two other email addresses being used by **Todd Dyer**
and/or **Tracy Bolton** which are tracy@growersliquidityfund.com and
info@growersliquidityfund.com.

116. On May 15, 2012, and pursuant to 18 USC Section 2703(f), I submitted
a request to **GoDaddy.com, LLC** asking **GoDaddy.com, LLC** to preserve records
and other evidence in its possession pertaining to tracy@growersliquidityfund.com
and info@growersliquidityfund.com for a period of 90 days pending the issuance of a
court order for those records.

58

117.    On April 5, 2012, I then completed a WHOIS search to find the registrant for the domain named sbcglobal.net to determine the contact information of the entity hosting the email address n.hind@sbcglobal.net (**Nicholas Hindman**).    I found that the registrant and technical contact is SBC Internet Services, Inc.

118.    For the period of October 25, 2010, through February 23, 2012, the UCA agent received and sent multiple emails to and from **Hindman's** email address of n.hind@sbcglobal.net.

119.    On April 6, 2012, I contacted SBC Internet Services, Inc. and was advised to contact and send all legal correspondence AT&T Internet Services.

120.    On Aril 25, 2012, and pursuant to 18 USC Section 2703(f), a request was submitted to **AT&T Internet Services Inc.,** asking **AT&T Internet Services Inc.,** to preserve records and other evidence in its possession pertaining to n.hind@sbcglobal.net for a period of 90 days pending the issuance of a court order for these records.

121.    On May 11, 2012, I was advised by a representative of **AT&T Internet Services Inc.,** that although n.hind@sbcglobal.net  may be associated with a valid AT&T Internet Services internet access username, the email account and all associated records (including account access logs, headers, and content) are officially maintained by **Yahoo! Inc.**

122.    On May 11, 2012, and pursuant to 18 USC Section 2703(f), a request was submitted to **Yahoo! Inc.,** asking **Yahoo! Inc.,** to preserve records and other evidence in its possession pertaining to n.hind@sbcglobal.net for a period of 90 days pending the issuance of a court order for these records.  On May 14, 2012, a representative of Yahoo! Inc. confirmed that communications and records related to n.hind@sbcglobal.net were being maintained on its system and would be preserved for ninety (90) days.

59

123.     During the face to face meeting that occurred on November 10, 2010, the UCA asked **Allen Todd (Todd Dyer)** for investor references.   On November 12, 2010, **Allen Todd (Todd Dyer)** emailed the UCA the contact information of **Melvin Krumdick** and Mark Borst.   The references listed the email address of **Melvin Krumdick** as frmelk@aol.com.

124.     On January 11, 2011, the UCA attempted to contact **Krumdick** via telephone and through email address frmelk@aol.com.   **Krumdick** responded to UCA using email address frmelk@aol.com on January 12, 2011.   The UCA then contacted **Krumdick** via telephone on January 12, 2011.

125.     On April 5, 2012, I then completed a WHOIS search to find the registrant for the domain named aol.com to determine the contact information of the entity hosting the email address frmelk@aol.com **(Melvin Krumdick).**   The registrant and technical contact for domain name aol.com is **AOL Inc.**

126.     On April 25, 2012, and pursuant to 18 USC Section 2703(f), a request was  submitted to **AOL Inc.,** asking **AOL Inc.,** to preserve records and other evidence in its possession pertaining to frmelk@aol.comfor a period of 90 days pending the issuance of a court order for these records.   On May 11, 2012, a representative of **AOL Inc.** confirmed that communications and records related to frmelk@aol.com were being maintained on its system and would be preserved for ninety (90) days.

127.     On February 16, 2012, **Tracy Lynn Bolton** with **Farmland Marketing Group** sent H.B. (an investor) bank account wiring instructions and information of a "private offer to exchange his securities for options" into **U.S. Growers Farmland Liquidity Fund, Inc.** using email address ycart22@gmail.com.   The email also stated that ycart22@gmail.com was being used on behalf of **Tracy Bolton's** other email address of Tracy@farmlandmarketinggroup.com.   On January 6, 2012, **Tracy**

Bolton, Chairman of the Board, solely incorporated **U.S. Growers Farmland Liquidity Fund, Inc.** in the State of Iowa. On January 19, 2012, **Tracy Bolton,** also listed as Chairman of the Board on the signature card, solely opened the **U.S. Growers Farmland Liquidity Fund, Inc.** This is the same bank account H.B. was sent wiring instructions for.

128. On April 23, 2012, I then completed a WHOIS search to find the registrant for the domain named gmail.com to determine the contact information of the entity hosting the email addresses ycart22@gmail.com and FarmlandMarketing@gmail.com. The registrant and technical contact for domain name gmail.com is **Google Inc.**

129. On April 25, 2012, and pursuant to 18 USC Section 2703(f), a request was submitted to **Google Inc.** asking **Google Inc** to preserve records and other evidence in its possession pertaining to ycart22@gmail.com and FarmlandMarketing@gmail.com for a period of 90 days pending the issuance of a court order for these records. On May 11, 2012, a representative of **Google Inc** confirmed that communications and records related to ycart22@gmail.com and FarmlandMarketing@gmail.com were being maintained on its system and would be preserved for ninety (90) days.

130. In my training and experience, I have learned that **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** provide a variety of on-line services, including electronic mail ("e-mail") access, to the general public. Subscribers obtain an account by registering with **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** During the registration process, **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** ask subscribers to provide basic personal information. Therefore, the computers of **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** subscribers) and information concerning subscribers and their use

61

of **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** services, such as account access information, e-mail transaction information, and account application information.

131. In general, an e-mail that is sent to a **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** subscriber is stored in the subscriber's "mail box" on **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** servers for a certain period of time.

132. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** servers, and then transmitted to its end destination. **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** often save a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** server, the e-mail can remain on the system indefinitely. Even if the sender deletes the e-mail, it may continue to be available on **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** servers for a certain period of time.

133. A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** but may not include all of these categories of data.

62

134. A **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.**

135. Subscribers to **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** might not store on their home computers copies of the e-mails stored in their **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** account. This is particularly true when they access their **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

136. In general, e-mail providers like **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

137. E-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

63

138.    In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

139.    In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

140.    I anticipate executing the warrants under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc.** to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachments G1, H1, I1, and J1. Upon receipt of the information described in Section I of Attachments G1, H1, I1, and J1, government-authorized persons will review that information to locate the items described in Section II of Attachments G1, H1, I1, and J1.

141.    This Court has jurisdiction to issue the requested warrants because it is "a court with jurisdiction over the offense under investigation." 18 U.S.C. § 2703(a).

142. Pursuant to 18 U.S.C. 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants.

## VIII. Conclusion

64

143. I submit that there exists probable cause to believe all of the items referred to in Attachments A1, C1, E1, F1, G1, H1, I1, and J1 of this Affidavit are items which are relevant to this investigation and pertain to violations of 18 U.S.C. §§ 1341, 1343, 1956 and 1957.

144. I submit that there exists probable cause to believe that these items in Attachments A1, C1, E1, will be found in and around the residence at **813 Kendall Lane, Lake Geneva, Wisconsin,** where **Todd Dyer** maintains his residence, in and around the residence at **1178 South Elmwood Avenue, Oak Park, Illinois** where **Melvin Krumdick** maintains his residence, and in and around the residence at **31615 Tall Grass Court, Lakemoor, Illinois** where **Tracy Bolton** maintains her residence.

145. I further submit, based on my training and experience, and the facts as set forth in this affidavit, that there exists probable cause to believe that these items in Attachments F1, G1, H1, I1, and J1 will be found on the computer systems in the control of **GoDaddy.com, LLC, AOL, Inc., Yahoo! Inc.,** and **Google Inc** there exists evidence of a crime and contraband or fruits of a crime.

146. I respectfully request that the attached warrants be issued authorizing the search of the Premises and Locations as described in Attachment A, C, E, F, G, H, I, J and the seizure of the items listed in A1, C1, E1, F1, G1, H1, I1, and J1.